IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


JASON MICHAUX, JANAYE MICHAUX-
ORRIS, CO-ADMINISTRATORS OF THE
ESTATE OF GREGORY MICHAUX;

    Plaintiffs,

    vs.

WARDEN JOHN TEMAS, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER ADAM SMITH, IN HIS
OFFICIAL AND INDICIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER SHAWN SCHULTZ, IN HIS
OFFICIAL AND INDICIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER MELVIN GRAY, IN HIS
OFFICIAL AND INDICIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER JONATHAN BLEDNICK, IN
HIS OFFICIAL AND INDICIDUAL
CAPACITIES; CAPTAIN  MICHAEL
KING, IN HIS OFFICIAL AND
INDIVIDUAL CAPACITIES; NURSE
CHERYL MCGAVITT, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES; NURSE
GEORGENE HEPPLE, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES AS
EMPLOYEE/AGENT OF SOUTHWEST
BEHAVIORAL CARE, INC.; AND
DEPUTY WARDEN EDWARD STRAWN,
IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES;

    Defendants,

**2:17-CV-01241-JFC**

JUDGE JOY FLOWERS CONTI

**<u>OPINION</u>**

## I. Introduction

This case arises from the suicide of Gregory Michaux ("Michaux") on September 26, 2015, at the Washington County Correctional Facility (the "WCCF" or "jail"). Pending before the court are *Daubert* motions,[1] filed on behalf of defendant Georgine Hepple ("Hepple"), a psychiatric nurse employed by Southwest Behavioral Care, Inc. ("Southwest") (ECF No. 56), and the correctional officer defendants[2] (ECF No. 57), to preclude the expert report and testimony of A.E. Daniel, M.D. ("Dr. Daniel"). The court held a *Daubert* hearing on July 31, 2019. Also pending are post-hearing motions filed by plaintiffs' counsel for leave to file a fourth amended complaint (ECF No. 66) and to reopen discovery (ECF No. 67). All motions are fully briefed and ripe for decision.

## II. Procedural History

Jason Michaux and Janaye Michaux-Orris, as co-administrators of the Estate of Gregory Michaux (the "estate" or "plaintiffs"), filed the initial complaint on September 25, 2017. After defendants filed a motion to dismiss, plaintiffs filed an amended complaint on March 6, 2018. Defendants renewed their motion to dismiss and plaintiffs filed a second amended complaint. The court struck this pleading because plaintiffs failed to obtain leave of court, as required by Federal Rule of Civil Procedure 15(a)(2) (ECF No. 19). Plaintiffs sought leave to file another amended complaint, which the court denied without prejudice after a hearing and argument. Minute Entry of May 31, 2018. The court entered a case management order ("CMO") setting a

---

[1] *Daubert* motions challenge the admissibility of expert testimony. *See generally*, 29 Wright & Gold, Federal Practice and Procedure §§ 6262-6270 (2d ed. 2016).

[2] The third amended complaint names as correctional defendants in their official and individual capacities: WCCF Warden John Temas ("Temas"), Deputy Warden Edward Strawn ("Strawn"), Correctional Officers Adam Smith ("Smith"), Shawn Schultz ("Schultz"), Melvin Gray ("Gray"), Jonathan Blednick ("Blednick"), Captain Michael King ("King") and nurse Cheryl McGavitt ("McGavitt") (ECF No. 32).

deadline of June 29, 2018, for amending the pleadings and joinder of new parties (ECF No. 25). On August 2, 2018, the court granted plaintiffs' motion for leave to file a third amended complaint, even though the deadline in the CMO had expired (ECF No. 30). The third amended complaint is the operative pleading in this case. It added three new defendants on August 13, 2018 (ECF No. 32). Defendants filed answers to the third amended complaint (ECF Nos. 34, 43).

The third amended complaint contains the following claims:

- Count I against all defendants, except for Warden Temas, in their individual and official capacities pursuant to 28 U.S.C. § 1983 for violation of Gregory Michaux's constitutional rights while he was a pretrial detainee at the jail for deliberate indifference in failing to prevent his suicide;
- Count II against Warden Temas in his individual and official capacity pursuant to 28 U.S.C. § 1983 for *Monell* liability and supervisory liability;
- Count III against all defendants in their individual capacities brought as a state law survival action pursuant to 20 Pa. Cons. Stat. § 3372 and 42 Pa. Cons. Stat. § 8302; and
- Count IV against all defendants in their individual capacities for wrongful death under Pennsylvania law.

At the *Daubert* hearing, the court expressed concern that the claims and legal theories were not clearly identified. Plaintiffs' counsel offered to submit a document to clarify them. The court permitted this opportunity, over defendants' objections. Tr. 56-57. In his post-hearing clarification (ECF No. 63), plaintiffs' counsel explained that the third amended complaint asserted the following claims:

1. Correctional officers Smith, Shultz, Gray and Blednick were actually aware of Michaux's particular vulnerability to suicide, due to: (a) torn bedsheets; (b) communications with counselors and nurses who treated him; and (c) the writings in his journal, which the officers were obligated to read, as pleaded in ¶¶ 46-50.

2. Captain King and Deputy Warden Strawn exhibited deliberate indifference by failing to: (a) prevent Michaux's suicide; (b) notify corrections officers, physician, counselor or warden that he was suicidal; (c) get him proper medical care; (d) supervise the corrections officers, nurses and counselor; and (e) require the staff to read journals/notebooks kept by inmates in the segregated housing unit ("SHU"), as pleaded in ¶ 53.

3. Nurses McGavitt and Hepple were deliberately indifferent by failing to: (a) prevent Michaux's suicide; (b) notify the corrections officers, physician, counselor or warden that he was suicidal; (c) get him proper medical care; (d) take action to get Michaux a consultation with a psychiatrist sooner; (e) read his journal or ask what he was writing in it; (f) learn of prior suicide attempts or torn bed sheets; and (g) observe that Michaux had a strong vulnerability to suicide, which would have been obvious to any lay person, as pleaded in ¶¶ 51-52.

4. Warden Temas (a) permitted a custom and practice of failing to ensure that inmate medical findings of suicidality were communicated to the corrections officers; (b) permitted a widespread practice of nurses and counselors failing to share inmates' vulnerability to suicide with corrections officers; (c) failed to provide appropriate suicide prevention training; and (d) failed to require staff to read jounals/notebooks kept by inmates in the SHU, as pleaded in ¶¶ 59-60.

On October 23, 2019, plaintffs filed a further clarification of their claims to incorporate ¶¶ 40-45 of the third amended complaint and delete two sentences in ¶ 46 (relating to videosurveillance cameras) (ECF No. 75).

The fact discovery deadline was December 31, 2018, almost seven months after the case management order entered on June 4, 2018.  Plaintiffs' counsel did not propound any interrogatories or document requests or notice any depositions prior to the deadline.  The court granted plaintiffs a one-month extension, until January 30, 2018, to complete depositions.  No other discovery was permitted.  (Minute Entry, November 15, 2018).  Plaintiffs' counsel tried to evade this limitation by serving subpoenas duces tecum, to which defendants objected.  In January 2018, plaintiffs' counsel filed motions for additional discovery and sanctions, which the court denied because he failed to serve timely written discovery.  In particular, the court denied as moot plaintiffs' motion to compel production of an inmate appointment log book, because it could not be located, and denied plaintiffs' motion for sanctions.  (Minute Entry, March 21, 2019).  The parties were directed to complete expert reports and discovery pursuant to the CMO deadlines.

Dr. Daniel prepared an expert report on March 19, 2019.  (ECF No. 57-2).  Defendants obtained responsive expert reports.  On May 6, 2019, Dr. Daniel submitted a rebuttal to the reports prepared by defendants' experts  (ECF No. 57-3).  The deadline to complete expert discovery, including expert depositions, was June 6, 2019.  Dr. Daniel was deposed on June 3, 2019 (ECF No. 57-4).

On June 20, 2019, defendants filed timely *Daubert* motions, which were fully briefed.  The court held a *Daubert* hearing on July 31, 2019, at which it raised significant concerns about the reliability, "fit," and underlying lack of evidence to support Dr. Daniel's opinions.  On September 4, 2019, plaintiffs' counsel filed the pending motions to amend the complaint and reopen discovery.

III. <u>Motions to amend complaint and reopen discovery</u>

Plaintiffs do not seek to amend their claims or change the named defendants. Instead, they seek leave to amend the complaint to assert new facts, i.e., that sheets with which Michaux tried to kill himself should have been visible to correctional officers through a window in the cell door during six previous suicide attempts. Plaintiffs aver that they first learned these facts from photographs produced in discovery. (ECF No. 66-1).

Defendants object strenuously and represent that those photographs were produced to plaintiffs' counsel 16 months before the motion, on May 11, 2018, as part of their initial disclosures. (ECF No. 68). Defendants contend that plaintiffs failed to establish good cause for their belated requests and argue that amendment would be unjust, prejudicial and futile.

Plaintiffs also seek to reopen fact discovery on the issue of the missing inmate appointment log book and ask the court to postpone ruling on the *Daubert* motions for 60 days to enable that additional discovery to occur. (ECF No. 67). Although unstated, but implied, plaintiffs want to reopen expert discovery to permit Dr. Daniels to submit new opinions based upon any information gleaned from this discovery. Defendants pointed out in their *Daubert* motions that Dr. Daniel does not have a factual basis to opine that nurses McGavitt or Hepple had a duty to schedule a follow-up appointment. In the *Daubert* hearing, the court was receptive to that contention. Plaintiffs seek to remedy that apparent flaw.

Defendants vigorously oppose the motion to reopen discovery as an untimely attempt to bolster Dr. Daniel's expert opinion after the close of fact and expert discovery in response to the criticisms raised in the *Daubert* hearing. Defendants contend that plaintiffs had ample opportunity to obtain this information during discovery, but failed to do so. Fed. R. Civ. P.

26(b)(2)(C)(ii). Plaintiffs failed to ask about the follow-up appointment, did not request the deposition of the prison psychiatrist, Dr. Ravi Kolli ("Dr. Kolli"), and failed to ask about the location of the appointment book until after the close of discovery. Defense counsel represented that they looked for the log book, but it was lost when the county changed medical providers away from Southwest. Tr. of February 6, 2019 hearing (ECF No. 69-1 at 72).

Defendants also contend that the missing appointment book is not important, because it is clear from the evidentiary record that Michaux was, in fact, scheduled to be seen by the psychiatrist. McGavitt testified in her deposition that she knew, as a fact, that the appointment book contained a notation for Michaux to be seen. McGavitt Deposition at 51-52 (explaining that if an inmate's appointment was postponed because others had a higher priority, the appointment would be bumped to the next week until he was seen).

There is an interplay between Federal Rules of Civil Procedure 15 and 16 when a party seeks amendment late in the case. A party may amend a pleading after a responsive pleading was served only by leave of court or by written consent of the adverse party. The court should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a). On the other hand, the court's case management deadlines may not be modified except upon a showing of "good cause" and the judge's consent. Fed. R. Civ. P. 16(b)(4).

Leave to amend may be denied based on undue delay, bad faith, dilatory motive, prejudice, or futility. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). In *Dimensional Communications, Inc. v. OZ Optics, Ltd.*, 148 F. App'x 82 (3d Cir. 2005), the court affirmed that a failure to satisfy Rule 16(b)'s "good cause" requirement was sufficient to deny a motion to amend a complaint filed six months after the deadline for amendments to pleadings. *Id.* at 85 (citing *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000)). In

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010), the court of appeals affirmed the district court's decision to deny leave to amend a pleading for the fourth time, after the deadline in the case management order, because the plaintiff failed to meet its burden to  demonstrate good cause and due diligence.

The court concludes that plaintiffs failed to meet the good cause requirement or demonstrate that they acted with due diligence in this case.  Plaintiffs did not articulate any reason for waiting over a year to seek to amend the complaint to assert facts gleaned from the photographs produced in defendants' initial disclosures.  Indeed, plaintiffs filed their third amended complaint in August 2018 (three months after receiving the photographs), but failed to include the averments they now seek to add.  Further amendment of the pleadings at this time, after completion of fact and expert discovery, the filing of four prior complaints, and expiration of the case management deadlines, would cause undue delay and prejudice to defendants.  Moreover, amendment is of little benefit because new factual averments in a complaint are of little utility at this stage of the case.  Summary judgment motions will not be decided on the pleadings, but on the admissible evidence developed during discovery.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (a party may not rely on its complaint to defeat a summary judgment motion, but instead must provide probative evidence to create a genuine issue for trial).

Plaintiffs did not articulate good cause to reopen discovery.  The reason they did not learn about the missing appointment book until Hepple's deposition on January 14, 2019,  was because their attorney did not engage in reasonable, timely discovery before the deadline expired.  In addition, on March 21, 2019, the court denied their motion to compel discovery of the appointment book and plaintiffs failed to establish a proper ground for the court to reconsider its

decision. *Max's Seafood Cafe, by Lou-Ann, Inc., v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999). A belated effort to reopen discovery to bolster a expert opinion, after a *Daubert* hearing raised fundamental concerns about the factual basis for that opinion, is not a valid basis to reopen discovery. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (rejecting a request to reopen discovery after experts were barred and explaining that litigation does not include a dress rehearsal or practice run for the losing party). Plaintiffs had four opportunities to file complaints to set forth their claims and legal theories and had ample time to complete fact and expert discovery and litigate the *Daubert* motions.

Defendants would be substantially prejudiced if plaintiffs were permitted to reopen fact and expert discovery at this late date. Most fundamentally, defendants are entitled to a ruling on their pending motions, which were timely filed in accordance with the case management order and which plaintiffs had a full opportunity to litigate. Litigation would never end if the losing party was allowed to rebut retroactively the flaws identified by defendants and the court. *See Winters*, 498 F.3d at 743. Defendants invested substantial resources in conducting fact discovery, obtaining expert witnesses, conducting expert discovery and preparing *Daubert* motions based on the evidentiary record developed pursuant to the court's case management order. These resources would be wasted if plaintiffs were permitted to reopen discovery and Dr. Daniel (or another expert) were permitted to offer different opinions. Defendants would be required to invest additional resources to conduct additional discovery, reevaluate their own experts' opinions, reevaluate any new opinions offered by plaintiffs' experts, and relitigate the *Daubert* motions. In addition, reopening discovery would cause a substantial delay in deciding this case, which is already more than two years old. In sum, plaintiffs' motions would cause undue cost,

delay and prejudice and are not consistent with the just, speedy and inexpensive determination of this case. *See* Fed. R. Civ. P. 1.

In sum, the motions for leave to file a fourth amended complaint (ECF No. 66) and to reopen discovery (ECF No. 67) will be DENIED.

IV. *Daubert* Motions

Defendants seek to preclude Dr. Daniel's reports, opinions and testimony in their entirety. The court summarizes the applicable law and factual record to provide a legal background for its analysis of Dr. Daniel's expert opinions.

A. **Generally Applicable Standards for Expert Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the Supreme Court instructed district courts to act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is ... reliable." *Id.* at 589. The United States Court of Appeals for the Third Circuit explained that Rule 702 "embodies a trilogy of restrictions" that expert testimony must meet for admissibility: qualification, reliability and fit. *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert

testimony has the burden of establishing each of these requirements by a preponderance of the evidence. *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir. 1999).

### 1. Qualification

An expert witness's qualification stems from his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. The witness therefore must have "specialized expertise." *Schneider,* 320 F.3d at 405. The court of appeals interprets the qualification requirement "'liberally,' holding that 'a broad range of knowledge, skills, and training qualify an expert as such.'" *Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 321 (3d Cir. 2003) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir. 1994)). When evaluating an expert's qualifications, district courts should not insist on a certain kind of degree or background. *Robinson v. Hartzell Propeller Inc.,* 326 F.Supp.2d 631, 667 (E.D. Pa. 2004). An expert's qualifications are determined with respect to each matter addressed in the proposed testimony. *Calhoun,* 350 F.3d at 322 ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."). "While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Id.*

Dr. Daniel is a licensed psychiatrist and was formerly the Chief of Psychiatry for the Missouri Department of Corrections. His qualifications as an expert in suicide prevention in prison are not disputed.[3]

### 2. Reliability

In *Daubert,* the Supreme Court stated that the district court's gatekeeper role requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is ...

---

[3] As discussed below, defendants challenge Dr. Daniel's qualifications to opine about whether corrections officers should routinely read journals of SHU inmates.

valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93. While the Court noted in *Daubert* that district courts were permitted to undertake a flexible inquiry into the admissibility of expert testimony under Rule 702, the court of appeals has enumerated the following eight factors that a district court may examine:

1. whether a method consists of a testable hypothesis;

2. whether the method has been subjected to peer review;

3. the known or potential rate of error;

4. the existence and maintenance of standards controlling the technique's operation;

5. whether the method is generally accepted;

6. the relationship of the technique to methods which have been established to be reliable;

7. the qualifications of the expert witness testifying based on the methodology; and

8. the non-judicial uses to which the method has been put.

*In re Paoli R.R Yard PCB Litigation,* 35 F.3d 717, 742 n. 8 (3d Cir. 1994) (*"Paoli II"*). This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case." *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806–07 (3d Cir. 1997). Under these factors, experts are not permitted to engage in a "haphazard, intuitive inquiry," but must explain the research and methodology they employed in sufficient detail in order to allow the other party's expert to test that hypothesis. *Oddi v. Ford Motor Co.,* 234 F.3d 136, 156 (3d Cir. 2000). Where an expert fails to use standards to control his or her analysis, "no 'gatekeeper' can assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put." *Id.* at 158.

"The evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli II,* 35 F.3d at 744. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell,* 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998)).  This restriction is disputed by the parties and will be addressed below.

### 3. Fit

The Rule 702 requirement that testimony "help the trier of fact to understand the evidence or to determine a fact in issue" is called the "fit" requirement. Fit requires that there be a "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Paoli II,* 35 F.3d at 743. "'Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" *Id.* (quoting *Daubert,* 509 U.S. at 591). The standard for fit is "not that high," although it is "higher than bare relevance." *Id.* at 745.  This restriction is disputed by the parties and will be addressed below.

### B. Timeline of Key Events

The following timeline was taken from Dr. Daniel's report (ECF No. 57-2 at 3-4).

| September 2014: | Michaux attempted suicide by hanging at WCJ and was on suicide watch. Dr. Kolli diagnosed him with opioid dependence, antisocial personality disorder and anxiety disorder. |
| --- | --- |
| March 23, 2015: | Michaux was detained again at WCJ.  A health care screening questionnaire  was prepared (marked "no" for prior suicide attempt). |

|                    | Michaux denied suicidal ideation, but admitted prior mental health care and suicide attempt in September 2014. |
|--------------------|---|
| April 2, 2015:     | Michaux denied medical clearance to work in the jail due to his history of suicide attempt, anger issues and blackouts. |
| April 7, 2015:     | A nursing note by Hepple reflected Michaux had anxiety, anger and sleep problems. Michaux denied suicidal ideation. |
| April 22, 2015:    | Michaux asked to see a doctor for depression, feeling isolated, anxiety and sleep problems. |
| May 5, 2015:       | Hepple noted Michaux had increased anxiety and agitation. |
| May 28, 2015:      | Dr. Kolli evaluated Michaux and diagnosed him with anxiety disorder (NOS) and Antisocial Personality Disorder. Michaux was started on doxepin. Michaux denied suicidal ideation. Dr. Kolli noted a follow-up appointment in 12 weeks. |
| August 19, 2015:   | Michaux was placed in the SHU for a disciplinary infraction. |
| UNDATED:           | Michaux made entries in his journal. |
| September 26, 2015: | Michaux committed suicide by hanging. |

### C. Summary of Substantive Law

Prison officials are not required to guarantee that an inmate will not commit suicide. *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017). On the other hand, if prison officials know or should know of the particular vulnerability to suicide of an inmate, then the United States Constitution imposes on them an obligation not to act with reckless indifference to that vulnerability. *Id.* The standard of liability requires that there must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.*

In this case, all the named defendants are laypersons,[4] in that they lack specialized training or expertise in identifying a suicide risk. Therefore, the "detainee's strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative

---

[4] Dr. Kolli, the prison pyschiatrist, is not named as a defendant.

action." *Id.* (citiations omitted). In addition to the particular vulnerability of the detainee, the law requires a relatively high level of culpability on the part of prison officials before holding them accountable, *i.e.*, reckless or deliberate indifference to that "strong likelihood" of suicide. *Id*. Mere negligence will not suffice. *Id*.

The elements of the prima facie case are: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Id*. at 223-24.

### D.   Application to this Case

As an initial matter, the correctional defendants argue that Dr. Daniel's use of the terms "reckless disregard," "should have known," and his references to substantial, imminent and obvious risk of suicide are legal conclusions that would confuse the jury. They argue that Dr. Daniel's opinions about a deviation from the standard of care (i.e., negligence) are irrelevant and confusing because under *Palakovic*, the risk of suicide must be "so obvious that a layperson would easily recognize the necessity for preventative action." *Palakovic*, 854 F.3d at 222. Plaintiffs submit that Dr. Daniel's use of phrases such as "should have known" and "substantial" can be cured by the jury instructions and represent that Dr. Daniel will comply with the court's directive about what phrases he can use. The court will resolve this issue, if necessary, closer to trial.

Defendants argue that Dr. Daniel's opinions are speculative, not reliable, and do not "fit" the evidence. The factual record developed in this case undermines the strength of the claims against the individual defendants in several respects. With respect to the first prong of the prima facie case, Michaux did not outwardly demonstrate a particular vulnerability to suicide. He denied suicidal ideation in his intake screening questionnaire in March 2015 and throughout his incarceration. *See* Timeline. Dr. Daniel agreed in his deposition that Michaux expressed suicidal ideation only by writing in his personal journal. Daniel Deposition at 36, 42.

With respect to the second prong of the prima facie case, Dr. Daniel testified in his deposition that many of the suicide risk factors were not communicated to the corrections officers so that they would be aware of Michaux's susceptibility to suicide. Daniel Deposition at 45. Dr. Daniel opined that the suicide screening questionnaire prepared when Michaux was booked in March 2015 did not reflect that Michaux (1) had attempted suicide in the WCCF in September 2014, (2) had a history of mental health care, (3) used psychotropic medication and (4) was opioid dependent. Daniel Report ¶ 3. Michaux's denial of suicidal ideation was taken at face value. Daniel Report ¶ 4. Dr. Daniel would not be able to opine that the prison officials named as defendants knew or should have known of Michaux's particular vulnerability. The corrections officer who conducted the initial screening questionnaire was not named as a defendant. Daniel Deposition at 123.

With respect to the third prong of the prima facie case, the factual record reviewed by Dr. Daniel did not demonstrate that each of the named defendants had sufficient contact with Michaux to support an opinion that they acted with deliberate indifference. For example, Dr. Daniel recognized that McGavitt was not directly involved in Michaux's care and had no reason to know of his risk for suicide. Daniel Deposition at 73, 142. Hepple was only at the WCCF for

four hours per week.  Daniel Deposition at 61.  She was provided a list of inmates that were already screened to be seen by her.  Daniel Deposition at 63. Some of the corrections officers named as defendants had little or no contact with Michaux in the SHU.  Tr. at 44-45.[5]  The court turns to Dr. Daniel's opinions regarding the named defendants.

### 1.  Nurse McGavitt

There is no evidence reviewed by Dr. Daniel to support an opinion that Nurse McGavitt is personally liable in this case.  In his deposition, Dr. Daniel agreed that McGavitt was not directly involved in Michaux's care and she did not know or have reason to know of Michaux's risk for suicide.  Daniel Deposition at 73, 142.  (ECF No 56-1).  Because McGavitt did not even know about Michaux's vulnerability, Dr. Daniel will not be permitted to testify that McGavitt was deliberately indifferent to Michaux's risk for suicide.  Any such opinion would not be reliable or fit.

### 2.  Nurse Hepple

In his report, Dr. Daniel opined that there was an unacceptable delay in responding to Michaux's sick call requests in April 2015.  Report ¶ 6.  During his deposition, Dr. Daniel testified that Hepple failed by not scheduling an appointment within 24 or 72 hours, and that there was enough information when she saw Michaux on April 7, 2015, to refer him to Dr. Kolli.  Deposition at 125-26.  Dr. Daniel also opined that Hepple erred by failing to schedule a 12-week follow-up appointment ordered by Dr. Kolli on May 28, 2015.  Report ¶ 8.

Hepple argues that Dr. Daniel's opinions are speculative and do not "fit." Hepple also contends that the opinions are not reliable because there is no evidence to support Dr. Daniel's

---

[5] Defense counsel indicated that this issue will be the basis for summary judgment motions.  It is also relevant to the reliability and fit of Dr. Daniel's opinions.

opinion that she was responsible to schedule psychiatric appointments or that a failure to schedule a follow-up appointment caused Michaux's death.

Dr. Daniel will not be permitted to offer any opinions about a delay in seeing Michaux in April 2015. Dr. Daniel recognizes that Michaux was seen by Dr. Kolli on May 28, 2015, and put on medication. *See* Timeline. There is no evidence that any delay in responding to Michaux in April 2015 was causally related to his suicide almost six months later. Tr. 51. Such an opinion would be unduly speculative, not reliable and would not fit.

Daniel's opinion that Hepple's failure to schedule a 12-week follow-up appointment in September caused Michaux's death is also unduly speculative and does not satisfy the "deliberate indifference" standard. *See Estate of Kempf v. Washington Cty.*, No. CV 15-1125, 2018 WL 4354547, at *17 (W.D. Pa. Sept. 12, 2018) ("A complaint that a prison or jail medical official "should have ordered additional observation is no more than a 'mere disagreement as to the proper medical treatment' that does not 'support a claim of [a constitutional] violation,' " *Pearson*, 850 F.3d at 543 (citing *Lanzaro*, 834 F.2d at 346), unless the defendant's "response so deviated from professional standards of care that it amounted to deliberate indifference.").

Dr. Daniel reasons that if Hepple had scheduled the twelve-week follow-up appointment, Dr. Kolli would have identified a suicidal condition and placed Michaux on a suicide watch. Daniel Report ¶ 8. This theory is speculative. Twelve weeks from May 28, 2015, would have been around August 19, 2105, which was about the same time Michaux pled guilty to disciplinary charges and was sentenced to 60 days in the SHU. There is no evidence that Michaux's suicidal condition (shown only by the undated journal) was present at that time. No one knows when the journal was written and his suicidal ideation began. Daniel Deposition at

34 ("Q: So you don't know if on or about August 19th he had started writing that journal yet?  A: I don't know.").

In addition, there is no evidence reviewed by Dr. Daniel to support an expert opinion that it was Hepple's responsibility to schedule Michaux's twelve-week follow-up appointment.  At the *Daubert* hearing, plaintiffs' counsel was unable to provide a factual basis for that opinion.  Tr. at 36-40.  Dr. Daniel testified in his deposition that it was his personal practice for the psychiatric nurse to make sure the follow-up appointment happened.  *See* Deposition at 69-75.  But there is no evidence that the WCCF used this same practice, particularly when Hepple was only at the jail four hours per week.  There was a brief reference in Hepple's deposition that both she and McGavitt prioritized appointments in the inmate log book, Hepple Deposition at 26, 29, but the only direct evidence reflects that Hepple had no duty to make the follow-up appointment for Michaux.  *Id*. at 29 (Q: "[W]ere you obligated to get that follow-up scheduled? A: No, sir.").

Unless there is contrary evidence, Dr. Daniel would have no factual basis to support his opinion that Hepple's failure to schedule a follow-up appointment constituted deliberate indifference to Michaux's risk for suicide.  Michaux did not submit any requests to be seen after April 2015, so Hepple had no reason to know that Michaux needed urgent attention.  McGavitt explained in her deposition that if an inmate's appointment was postponed because others had a higher priority, the appointment would be bumped to the next week until he was seen.  McGavitt Deposition at 51-52.  McGavitt testified that she knew, as a fact, that the appointment book contained a notation for Michaux to be seen.  *Id*.  Plaintiffs did not point to any contrary evidence.  An expert's opinions cannot be based on subjective beliefs or unsupported speculation. *Holbrook v. Lykes Bros. S.S. Co. Inc*., 80 F.3d 777, 784 (3d Cir. 1996).

For all these reasons, Dr. Daniel will not be permitted to opine that Hepple was deliberately indifferent to Michaux's risk for suicide. Any such opinion would not be reliable or fit.

### 3. Corrections Officers and Captain King

During his deposition, Dr. Daniel was asked to identify what each individual officer did that was in reckless disregard of the suicide risk. In response, Dr. Daniel stated: "Captain King is not responsible." Deposition at 120. Dr. Daniel explained: "The reckless disregard is by the system, that the system should have known. . . . I cannot opine on the individual responsibility as to what [a particular individual] did nor did not do. . . ." Deposition at 120-21. Dr. Daniel confirmed that he cannot say what each defendant did that was in reckless disregard to the suicide risk. Deposiiton at 121. Upon follow-up questioning, Dr. Daniel reiterated that all his opinions regarding the causes of Michaux's suicide were systemic failures, not the failures or actions of any individual.[6] Deposition at 122.

The only specific opinion Dr. Daniel offered regarding the named corrections officers was that the SHU officers acted in reckless disregard by not reading Michaux's journal because Michaux had expressed suicidal ideation and made a suicide attempt in the jail the year before. Daniel Report Opinion 11, Daniel Deposition at 42. Defendants seek to strike this opinion as speculative, not based on any standards, and outside Dr. Daniel's expertise.

Dr. Daniel recognized in his expert report that jail staff do not customarily read an inmate's writings except when there is a security or escape risk. Report ¶ 11. Dr. Daniel did not provide an authoritative source for his opinion that the corrections officers should have read Michaux's journal, but based it on his knowledge and experience. Tr. 14-15. As the defense

_____

[6] Dr. Daniel did identify one individual failure -- the corrections officer who did the suicide prevention screening questionnaire -- but recognized that person was not named as a defendant in this case. Deposition at 123.

aptly pointed out, Dr. Daniel had no knowledge or experience in supervising corrections staff. He was recognized as an expert in suicide prevention in the correctional setting, but not in the supervision of corrections officers. Tr. 16. Because he does not have the requisite qualifications, Dr. Daniel will not be permitted to opine that corrections officers should read the writings of an inmate as a general practice

Another fundamental problem with Dr. Daniel's opinion is that it relies on 20/20 hindsight. If the officers had reviewed the journal, they would have been concerned about suicide, but when the suicide risk factors relevant to Michaux were not communicated to the corrections officers, there was no reason for them to read the journal in the first place. Dr. Daniel testified in his deposition that many of the suicide risk factors were not communicated to the corrections officers so that they would be unaware of Michaux's susceptibility to suicide. Daniel Deposition at 45. Daniel's opinion that Michaux was obviously suicidal is based exclusively on the contents of his journal. Deposition at 36. Dr. Daniel conceded that Michaux only expressed suicidal ideation in the writings themselves. Deposition at 42. The journal is undated and there is no evidence that any defendant ever saw it. Deposition at 78. In sum, Dr. Daniel provides no basis, other than speculation in hindsight, for defendants to have read Michaux's journal.

In sum, Dr. Daniel will not be permitted to offer any opinions that the individual corrections officers or Captain King were deliberately indifferent to Michaux's risk for suicide. Any such opinions would not be reliable or fit and Dr. Daniel lacks the qualifications to opine that corrections staff should read inmate journals as a general practice.

4. Deputy Warden Strawn

Dr. Daniel opined that both Warden Temas and Deputy Warden Strawn were responsible for the systemic failure to prevent Michaux's suicide. Daniel Report ¶ 16. This opinion is inconsistent with the claims alleged in the third amended complaint. Only Warden Temas allegedly permitted unconstitutional customs and practices to exist, as pleaded in count 2 of the third amended complaint. The complaint averred that Warden Temas (not Deputy Warden Strawn) was the final policymaker in the facility. As the court explained during the *Daubert* hearing, if this claim against Deputy Warden Strawn is not in the complaint, then the opinions of Dr. Daniel about those matters would not be relevant or fit. Tr. 57. For the reasons set forth above, plaintiffs will not be permitted to amend the complaint again.

The claims asserted in the third amended complaint against Deputy Warden Strawn are virtually identical to the claims against Captain King, whom Dr. Daniel admitted "was not responsible." Daniel Deposition at 120. There is no evidence reviewed by Dr. Daniel of any personal actions or inactions taken by Deputy Warden Strawn. Dr. Daniel, therefore, will not be permitted to opine regarding systemic failures or deliberate indifference by Deputy Warden Strawn. Any such opinions would not be reliable or fit.

5. Warden Temas

It is clear that the gravamen of Dr. Daniel's expert opinion is that Michaux's suicide was caused by systemic failures, rather than the failures or actions of any individual. Deposition at 120-22. The precise contours of the alleged systemic failures are not clear. During the *Daubert* hearing, the court expressed confusion about the actual theory of the case, and commented that Dr. Daniel's opinions would cause confusion for the jury, particularly in light of the difficult standard to show that a layperson was deliberately indifferent to Michaux's suicide risk. Tr. 26-27. Plaintiffs' counsel responded that he was asserting: (1) a failure to train claim regarding the

initial intake suicide screening, (2) a failure to train about communications between the medical staff and corrections staff, and (3) a failure to train about reading inmates' journals in the SHU. Tr. 46.

The third amended complaint, ¶¶ 59-60, alleges that Warden Temas (a) permitted a custom and practice of failing to ensure that inmate medical findings of suicidality were communicated to the corrections officers; (b) permitted a widespread practice of nurses and counselors failing to share inmates' vulnerability to suicide with corrections officers; (c) failed to provide appropriate suicide prevention training; and (d) failed to require staff to read journals/notebooks kept by inmates in the SHU. Plaintiffs' post-hearing "clarifications" failed to shed additional light on these theories. (ECF Nos. 63, 75).

Dr. Daniel opined in his report that Michaux was improperly placed in a segregated cell. Daniel Report ¶ 10. In his deposition, Dr. Daniel explained that mentally ill patients should not be placed in segregation, particularly for a minor infraction like fighting, and should not be kept there for almost 60 days. Deposition at 35. There was no claim asserted in the complaint about placement in the SHU. These opinions will, therefore, not be permitted because they do not "fit" the claims asserted in this case.

Dr. Daniel did not attribute the correctional officers' failure to read Michaux's journal to a failure to train. Daniel Report ¶ 11. Dr. Daniel will not be permitted to opine that Warden Temas was deliberately indifferent to Michaux's suicide risk for failing to require staff to read journals/notebooks kept by inmates in the SHU.

Dr. Daniel opined that Warden Temas had ultimate responsibility to ensure proper communication and training necessary to identify Michaux's suicide risk and that the failure to do so constituted deliberate indifference. Daniel Report ¶ 16. Dr. Daniel opined that the WCCF

did not provide any specific training to its staff in performing suicide screening, that training in identification and recognition of mental illness was inadequate, and that the facility had substantial problems with coordination of care and communication between correctional staff and health care staff about vulnerability to suicide. Daniel Report ¶¶ 12, 13, 15. At his deposition, Dr. Daniel identified the lack of a mechanism to share information between the health care staff and the corrections staff, and to communicate Michaux's risk factors. Deposition at 43-44. These opinions are within Dr. Daniel's qualifications, based on facts in the record reviewed by Dr. Daniel, and fit the claims asserted in the third amended complaint against Warden Temas. Defendants' motions will be denied as to these opinions.[7]

---

[7] This ruling is without prejudice to defendants' ability to file summary judgment motions regarding the viability of these claims. *See, e.g., Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (failure to train "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations"); *Robinson v. Fair Acres Geriatric Center*, 722 F. App'x 194, 199 (3d Cir. 2018) ("In order for a failure-to-train claim to support *Monell* liability, a plaintiff must show 'that in light of the duties assigned to [the relevant employees,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'").

Conclusion

For the reasons set forth above, plaintiffs' motions to reopen discovery and the pleadings will be denied.  Defendants' *Daubert* motions to exclude the opinions of Dr. Daniel will be denied in part, i.e., with respect to his opinions that Warden Temas failed to provide any specific training to WCCF staff in performing suicide screening, that training in identification and recognition of mental illness was inadequate, and that the facility had substantial problems with coordination of care and communication between correctional staff and health care staff about vulnerability to suicide in Daniel Report ¶¶ 12, 13, 15, and granted in all other respects.

An appropriate order follows.

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
Dated:  December 5, 2019                     Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | |
|---|---|
| JASON MICHAUX, JANAYE MICHAUX-ORRIS, CO-ADMINISTRATORS OF THE ESTATE OF GREGORY MICHAUX; <br><br> Plaintiffs, <br><br> vs. <br><br> WARDEN JOHN TEMAS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; CORRECTIONAL OFFICER ADAM SMITH, IN HIS OFFICIAL AND INDICIDUAL CAPACITIES; CORRECTIONAL OFFICER SHAWN SCHULTZ, IN HIS OFFICIAL AND INDICIDUAL CAPACITIES; CORRECTIONAL OFFICER MELVIN GRAY, IN HIS OFFICIAL AND INDICIDUAL CAPACITIES; CORRECTIONAL OFFICER JONATHAN BLEDNICK, IN HIS OFFICIAL AND INDICIDUAL CAPACITIES; CAPTAIN MICHAEL KING, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; NURSE CHERYL MCGAVITT, IN HER OFFICIAL AND INDIVIDUAL CAPACITIES; NURSE GEORGENE HEPPLE, IN HER OFFICIAL AND INDIVIDUAL CAPACITIES AS EMPLOYEE/AGENT OF SOUTHWEST BEHAVIORAL CARE, INC.; AND DEPUTY WARDEN EDWARD STRAWN, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; <br><br> Defendants, | **2:17-CV-01241-JFC** <br><br> JUDGE JOY FLOWERS CONTI |

ORDER

AND NOW, this 5th day of December, 2019, in accordance with the foregoing memorandum opinion,

IT IS HEREBY ORDERED that:

(1) plaintiffs' motion for leave to file a fourth amended complaint (ECF No. 66) is DENIED;

(2) plaintiffs' motion to reopen discovery (ECF No. 67) is DENIED; and

(3) defendants' motions to preclude the expert report and testimony of A.E. Daniel, M.D. (ECF Nos. 56, 57) are DENIED IN PART, i.e., with respect to his opinions that Warden Temas failed to provide any specific training to staff in performing suicide screening, that training in identification and recognition of mental illness was inadequate, and that the facility had substantial problems with coordination of care and communication between correctional staff and health care staff about vulnerability to suicide as set forth in Daniel Report ¶¶ 12, 13, 15, and GRANTED IN ALL OTHER RESPECTS.

/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge