IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JASON MICHAUX, JANAYE MICHAUX-
ORRIS, CO-ADMINISTRATORS OF THE
ESTATE OF GREGORY MICHAUX;

      Plaintiffs,

    vs.

WARDEN JOHN TEMAS, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER ADAM SMITH, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER SHAWN SCHULTZ, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER MELVIN GRAY, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITIES;  CORRECTIONAL
OFFICER JONATHAN BLEDNICK, IN
HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; CAPTAIN  MICHAEL
KING, IN HIS OFFICIAL AND
INDIVIDUAL CAPACITIES; NURSE
CHERYL MCGAVITT, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES; NURSE
GEORGENE HEPPLE, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES AS
EMPLOYEE/AGENT OF SOUTHWEST
BEHAVIORAL CARE, INC.; AND
DEPUTY WARDEN EDWARD STRAWN,
IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES;

      Defendants,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**2:17-CV-01241-JFC**

JUDGE JOY FLOWERS CONTI

**<u>OPINION</u>**

I.     Introduction

This case arises from the tragic suicide of Gregory Michaux ("Michaux") on September 26, 2015, at the Washington County Correctional Facility (the "WCCF" or "jail").  Pending before the court are summary judgment motions filed on behalf of defendant Georgine Hepple ("Hepple"), a psychiatric nurse employed by Southwest Behavioral Care, Inc. ("Southwest") (ECF No. 91), and the correctional defendants[1] (ECF No. 87).  The parties thoroughly developed their respective positions in the Concise Statements of Material Facts ("CSMF")[2] and the motions are fully briefed and ripe for decision.

Plaintiffs withdrew their claims against (or conceded that summary judgment may be granted in favor of) defendants Shultz, Blednick, King and Strawn.  Plaintiffs maintain their claims against Hepple, McGavitt, Smith, Gray and Temas.

II.     Procedural History

Jason Michaux and Janaye Michaux-Orris, as co-administrators of the Estate of Gregory Michaux ("plaintiffs"), filed the initial complaint on September 25, 2017.  After all the defendants named in the complaint filed a motion to dismiss, plaintiffs filed an amended complaint on March 6, 2018.  All defendants named in the amended complaint renewed their motion to dismiss and plaintiffs filed a second amended complaint.  The court struck this pleading because plaintiffs failed to obtain leave of court, as required by Federal Rule of Civil

---

[1] The third amended complaint names as correctional defendants in their official and individual capacities:  WCCF Warden John Temas ("Temas"), Deputy Warden Edward Strawn ("Strawn"), Corrections officers Adam Smith ("Smith"), Shawn Schultz ("Schultz"), Melvin Gray ("Gray"), Jonathan Blednick ("Blednick"), Captain Michael King ("King") and Cheryl McGavitt ("McGavitt"), the nursing supervisor at WCCF  (ECF No. 32).

[2] The court, unless otherwise noted, will cite to the Combined CSMFs (ECF Nos. 110, 111).  Confusingly, both Hepple and the correctional defendants submitted exhibits A through S.  The correctional defendants' exhibits will be cited as "D-_."  Since the parties attached many of the same exhibits, it would have been preferable for all parties to file a single set of exhibits.

Procedure 15(a)(2) (ECF No. 19).  Plaintiffs sought leave to file another amended complaint, which the court denied without prejudice after a hearing and argument.  Minute Entry of May 31, 2018.  The court entered a case management order ("CMO") setting a deadline of June 29, 2018, for amending the pleadings and joinder of new parties (ECF No. 25).  On August 2, 2018, the court granted plaintiffs' motion for leave to file a third amended complaint, even though the deadline in the CMO had expired (ECF No. 30).  The third amended complaint is the operative pleading in this case.  It added three new defendants on August 13, 2018 (ECF No. 32).  All defendants named in that complaint (the "named defendants") filed answers to the third amended complaint (ECF Nos. 34, 43).

The third amended complaint contains the following claims:

- Count I against all named defendants, except for Warden Temas, in their individual and official capacities pursuant to 28 U.S.C. § 1983 for violation of Gregory Michaux's constitutional rights while he was a pretrial detainee at the jail for deliberate indifference in failing to prevent his suicide;
- Count II against Warden Temas in his individual and official capacity pursuant to 28 U.S.C. § 1983 for *Monell* liability and supervisory liability;
- Count III against all named defendants in their individual capacities brought as a state law survival action pursuant to 20 Pa. Cons. Stat. § 3372 and 42 Pa. Cons. Stat. § 8302; and
- Count IV against all named defendants in their individual capacities for wrongful death under Pennsylvania law.

The court conducted a *Daubert* hearing on July 31, 2019.  At the hearing, the court expressed concern that the claims and legal theories were not clearly identified.  Plaintiffs' counsel offered to submit a document to clarify them.  The court permitted this opportunity, over all named defendants' objections.  (Tr. 56-57, ECF No. 64).  In his post-hearing clarification (ECF No. 63), plaintiffs' counsel explained that the third amended complaint asserted the following claims:

1. Corrections officers Smith, Shultz, Gray and Blednick were actually aware of Michaux's particular vulnerability to suicide, due to: (a) torn bedsheets; (b) communications with counselors and nurses who treated him; and (c) the writings in his journal, which the officers were obligated to read, as pleaded in ¶¶ 46-50.

2. Captain King and Deputy Warden Strawn exhibited deliberate indifference by failing to: (a) prevent Michaux's suicide; (b) notify corrections officers, physician, counselor or warden that he was suicidal; (c) get him proper medical care; (d) supervise the corrections officers, nurses and counselor; and (e) require the staff to read journals/notebooks kept by inmates in the segregated housing unit ("SHU"), as pleaded in ¶ 53.

3. Nurses Hepple and McGavitt were deliberately indifferent by failing to: (a) prevent Michaux's suicide; (b) notify the corrections officers, physician, counselor or warden that he was suicidal; (c) get him proper medical care; (d) take action to get Michaux a consultation with a psychiatrist sooner;  (e) read his journal or ask what he was writing in it; (f) learn about prior suicide attempts or torn bed sheets; and (g) observe that Michaux had a strong vulnerability to suicide, which would have been obvious to any lay person, as pleaded in ¶¶ 51-52.

4. Warden Temas (a) permitted a custom and practice of failing to ensure that inmate medical findings of suicidality were communicated to the corrections officers; (b) permitted a widespread practice of nurses and counselors failing to share inmates' vulnerability to suicide with  corrections officers; (c) failed to provide appropriate suicide prevention training; and (d) failed to require staff to read journals/notebooks kept by inmates in the SHU, as pleaded in ¶¶ 59-60.

On October 23, 2019, plaintiffs filed a further clarification of their claims to incorporate ¶¶ 40-45

of the third amended complaint and delete two sentences in ¶ 46 (relating to video surveillance

cameras) (ECF No. 75).

### III.   Factual Background

#### A.  Fact and Expert Discovery Record

The fact discovery deadline was December 31, 2018, almost seven months after the case

management order entered on June 4, 2018.  Plaintiffs' counsel did not propound any

interrogatories or document requests or notice any depositions prior to the deadline.[3]  The court

granted plaintiffs a one-month extension, until January 30, 2018, to complete depositions.  No

other discovery was permitted pursuant to Federal Rule of Civil Procedure 26(b)(2)(C)(ii) ("the

court must limit the frequency or extent of discovery" if . . . "the party seeking discovery has had

ample opportunity to obtain the information by discovery in the action").  (Minute Entry,

November 15, 2018).

  Plaintiffs' counsel nonetheless sought further discovery by, among other things, serving

subpoenas duces tecum, to which defendants objected.  In January 2018, plaintiffs' counsel filed

motions for additional discovery and sanctions.  After a hearing on March 21, 2019, defendants

agreed to produce certain documents and the court permitted discovery of documents which

plaintiffs may not have known about prior to depositions.  One document which arguably fell

within that category was an inmate appointment log book.  Defense counsel represented that the

log book was turned over to a new psychiatric care provider which looked for the log book, but

could not find it; in other words, the log book was lost when the county changed medical

providers.  (Tr. of February 6, 2019 hearing, ECF No. 69-1 at 72).  The court denied as moot

plaintiffs' motion to compel production of that inmate appointment log book, because it could

not be located.  Plaintiffs' motion for sanctions was denied because plaintiffs failed to serve

timely written discovery.  (Minute Entry, March 21, 2019).  The court found that plaintiffs did

not show due diligence or good cause to overcome the limitations of Rule 26(b)(2)(C)(ii) and did

not order other documents to be produced.  The court, however, precluded defendants from using

or referring to any documents they had not produced to plaintiffs, including for purposes of

summary judgment motions or trial. (Hearing, November 15, 2018).

---

[3] Plaintiffs' counsel explained that the failure to conduct discovery occurred because he is a solo
practitioner and was stretched thin by his work on another case.  (Motions Hearing, March 21,
2019).

The parties were directed to complete expert reports and discovery pursuant to the CMO deadlines. Dr. A.E. Daniel ("Dr. Daniel") prepared an expert report on behalf of plaintiffs on March 19, 2019. (ECF No. 57-2). Defendants obtained responsive expert reports. On June 20, 2019, defendants filed timely *Daubert* motions, which were fully briefed. The court held a *Daubert* hearing on July 31, 2019. Although Dr. Daniel's qualifications as an expert in suicide prevention in the correctional setting were not disputed, the court raised significant concerns about the reliability, "fit," and underlying lack of evidence to support many of Dr. Daniel's opinions.

After post-hearing briefing, the court issued an opinion and order on December 5, 2019 (ECF No. 82).[4] As set forth more fully in that opinion, the court: (1) denied plaintiffs' motion to reopen discovery as an improper post-hoc effort to bolster their expert's testimony; (2) granted defendants' motions to preclude Dr. Daniel from testifying about deliberate indifference by any individual defendant because he was unable to opine about any individual responsibility;[5] and (3) precluded Dr. Daniel from testifying that corrections officers had a duty to read inmates' writings because he lacked the proper qualifications in the supervision of corrections officers. (ECF No. 82 at 20-21). Defendants' *Daubert* motions were otherwise denied and Dr. Daniel was permitted to opine about "systemic failure," including: (1) Warden Temas failed to provide any specific training to the WCCF staff in performing suicide screening, (2) the training in identification and recognition of mental illness was inadequate, and (3) the facility had substantial problems with coordination of care and communication between the correctional staff

---

[4] The court declines the invitation in plaintiffs' summary judgment brief (ECF No. 95 at 8-9) to reconsider that decision. Plaintiffs did not make a formal motion and did not point to a change in law, new evidence, clear error or manifest injustice that would justify reconsideration. *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

[5] Dr. Daniel testified in his deposition that the reckless disregard of Michaux's suicide risk was "by the system . . . I cannot opine on the individual responsibility as to what [a particular individual] did nor did not do. . . ." (ECF No. 82 at 20, quoting Daniel Deposition at 120-21).

and the health care staff about vulnerability to suicide.  (ECF No. 82 at 23-24).  The court's

decision was without prejudice to the named defendants' ability to seek summary judgment on

those theories. (ECF No. 82 at 24 n.7).

### B.  Michaux's Screening and Medical Care

The facts about Michaux's medical history, the suicide screening procedures and the medical

care he received at WCCF are largely undisputed (ECF Nos. 110, 111).

### 1.  The prior suicide attempt in 2014

On August 6, 2014, during a prior stint at the WCCF, Michaux was found in his cell in the

SHU with a bed sheet around his neck and hooked on the bars.  Upon examination, he had no

marks on his neck.  Michaux stated:  "I told them I wanted out of here."  (Ex. D-T, ECF No.

108).  He was moved to an observation room and monitored.  Dr. Ravi Kolli ("Dr. Kolli"), the

prison psychiatriast, assessed him on August 7, 2014.  Michaux denied being suicidal or having

suicidal ideas or mental health problems and stated he just wanted to talk to someone to find out

what was going on.  (Pl. Ex. 1, ECF No. 98-1).  Dr. Kolli noted that Michaux was not

undergoing mental health treatment and had no psychiatric history, but was abusing vicodin and

percoset.  *Id.*  Dr. Kolli recorded Michaux's thought content as not being suicidal.  Michaux told

him:  "I did not.  I wasn't really trying to."  *Id.*  Dr. Kolli diagnosed Michaux with opioid

dependence, antisocial personality disorder and anxiety disorder.  *Id.*

On September 7, 2014, Michaux told a nurse:  "If you don't give me some sleeping pills, I

am going to hurt myself."  (Ex. D-T, ECF No. 108).  Michaux was moved to suicide prevention

and was scheduled to be seen by Dr. Kolli.  *Id.*  There, however, is no record of a follow-up

appointment in 2014 with Dr. Kolli.  A nurse's note on September 18, 2014, reflects that Michaux was being cleared to go back to work release.  (Pl. Ex. 1, ECF No. 98-1).

### 2. Intake procedures in March 2015

On March 23, 2015, Michaux was detained again at the WCCF after being charged with aggravated assault of his girlfriend.[6]  A suicide prevention screening questionnaire was prepared by corrections officer Greg Strawn (who is not named as a defendant in this case).  Each question was marked "no," including whether Michaux had a prior arrest or suicide attempt, and the total weighted score was 0.  (Pl. Ex. 2, ECF No. 98-1).  There is a notation:  "Detainee showed serious psychiatric problems during prior incarceration."  *Id.*  The result of the screening was:  "No or low risk.  Action not needed."  *Id.*

Later on March 23, 2015, an intake health evaluation was performed.  Michaux admitted a prior suicide attempt by hanging in September 2014.  (Pl. Ex. 3, ECF No. 98-1).  Michaux denied having considered suicide and reported he "hasn't thought about it since."  *Id.*  Michaux disclosed he was currently undergoing mental health treatment at Wesley Spectrum for anger issues.  *Id.*

### 3. Evaluations by Medical Staff

Hepple, a nurse, relied on WCCF personnel and inmate sick call requests to notify her which inmates needed to be seen by medical staff.  At the beginning of Hepple's 4-hour weekly shift at the WCCF, she was handed a list compiled by WCCF staff of inmates who requested to be seen or were otherwise referred to the psychiatric staff.  On average, Hepple saw 8 to 10 inmates during her shift and consulted with Dr. Kolli as needed.

In March 2015, soon after he was detained, Michaux filled out an inmate request slip asking to see a "mental doctor" for anxiety, stress and sleeplessness.  (Pl. Ex. 4, ECF No. 98-1).  He

---

[6] Plaintiffs' exhibit 12 (ECF No. 98-1) reflects this was his third time in the WCCF.

noted that he was scheduled to see a doctor in April 2015, but would be unable to attend that appointment because he was in custody. *Id.* The request slip reflects a note by Hepple that no follow up was scheduled and Michaux would be monitored. *Id.*

On April 2, 2015, Michaux was denied medical clearance to work in the jail. The stated reasons were his history of suicide attempt (tied sheet around neck), anger issues and blackouts. (Pl. Ex. 8, ECF No. 98-1).

Hepple met with Michaux on April 7, 2015 (Pl. Ex. 5, ECF No. 98-1). Hepple's progress notes reflect that Michaux was being seen at Wesley Spectrum at his probation officer's request prior to coming to jail, no charges had yet been filed by the probation office, and Michaux was angry about being detained and not being allowed to be an inmate worker. Michaux denied drug abuse problems. Hepple noted Michaux's attempted suicide in 2014 by hanging and reported that Michaux denied suicidal ideation at this time. *Id.* Hepple recorded Michaux's depression, sleep disturbance, increased anxiety, paranoia about everything, ongoing anger issues and agitated mood. Michaux, however, was oriented, had good eye contact and had organized thoughts. He requested sleep medication. Hepple gave him handouts, explained relaxation techniques and noted she would continue to monitor Michaux at his request. *Id.* Nothing about the visit indicated to Hepple that Michaux was at risk for suicide. Hepple Deposition at 63.[7]

Michaux submitted another inmate request form on April 22, 2015, to be seen by a psychiatrist. He reported: "I am still feeling very isolated and depressed. I can't sleep and I'm nervous all day and I don't know why it seems all I do is bite my nails all day long." (Pl. Ex. 4,

---

[7] Plaintiffs admit this was Hepple's belief, but contend she was wrong because Michaux exhibited 14 risk factors (ECF No. 111 ¶ 21). Portions of the Hepple Deposition transcript are found at ECF Nos. 90-5, 91-3, 98-3, and 106-1. Because there are multiple exhibits of her deposition in the record, citations will be to the page of her deposition transcript.

ECF No. 98-1).  Hepple noted on the request slip that Michaux would be referred to Dr. Kolli for evaluation of medication management.   *Id.*

Hepple's progress notes of May 5, 2015 (Pl. Ex. 6, ECF No. 98-1), reflect her last encounter with Michaux.  Michaux reported that his girlfriend did not show up at court and the charges were to be dropped.  Michaux was upset because he was moved to the fourth floor of the WCCF and reported anxiety, depression, racing thoughts and sleep difficulty.  Michaux was oriented and had good eye contact and organized thoughts. His mood was agitated, but cooperative.  Michaux denied suicidal ideation.  *Id.*  Hepple referred him to Dr. Kolli for medication management.[8] Hepple did not believe Michaux was at risk for suicide on May 5, 2015.  Hepple Deposition at 64.

On May 28, 2015, Dr. Kolli evaluated Michaux.  Dr. Kolli's notes (Pl. Ex. 7, ECF No. 98-1) reflect that Michaux was not on any prescribed medications, but was self-medicating with Tylenol PM to fall asleep. Michaux reported feeling depressed because his girlfriend's actions resulted in his incarceration, but denied any suicidal feelings.  He was mildly fidgety and rubbed his hands.  Michaux reported having auditory or visual hallucinations and that he did not like being around other people.  Dr. Kolli noted Michaux had no suicidal ideation/plan, but had homicidal ideation at times.  Michaux's impulse control, judgment and insight were poor.  Dr. Kolli diagnosed Michaux with a history of marijuana abuse, anxiety disorder (NOS) and Antisocial Personality Disorder.  Michaux was prescribed Doxepin, which he had previously taken.   *Id.*  Dr. Kolli ordered a follow-up appointment in 12 weeks.  (ECF No. 91-2 at 13).

_____

[8] Hepple did not recall treating Michaux.  Hepple Deposition at 60.  McGavitt never met Michaux.  McGavitt Dep at 80.  Portions of the McGavitt Deposition transcript are found at ECF Nos. 90-3, 91-5, 98-3 and 106-1.  Because there are multiple exhibits of McGavitt's deposition in the record, citations will be to the page of her deposition transcript.

4.   Events After Dr. Kolli's Examination

There is no evidence in the record that Hepple or McGavitt received any further information about Michaux's risk for suicide after Dr. Kolli's examination on May 28, 2015.  Michaux did not submit any inmate sick call request forms after April 22, 2015.

The correctional staff at the WCCF were obligated to look for signs that an inmate was at risk for suicide and were trained to recognize the behaviors that would give them reason to believe an inmate was at risk for suicide.  (ECF No. 111 ¶ 42).  There is no evidence that any corrections officer reported that Michaux was experiencing mental health issues or was at risk for suicide.

Michaux took his medication every night without complaint.  (Pl. Ex. 12, ECF No. 98-1). [9] Nurses delivering medication did not observe any behavior or verbalization of changes in his demeanor or thoughts.  *Id.*

On June 22, 2015, Michaux's probation was revoked.  (Ex. D-S, ECF No. 90).  On August 4, 2015, Michaux's trial was postponed and rescheduled for September 29, 2015.  (ECF No. 91-4 at 27).

On August 18, 2015, Michaux was placed in the SHU for fighting with another inmate. (ECF No. 110 ¶ 51).  The next day, Michaux pleaded guilty to a disciplinary infraction and was sentenced to 60 days in the SHU.  There is no evidence that any named defendant was involved in placing Michaux in the SHU.  (ECF No. 111 ¶ 13).  On four occasions, Michaux's sentence in

_____

[9] Plaintiffs' exhibit 12 is a timeline compiled by McGavitt on September 28, 2015 (*see* Pl. Ex. 16, ECF No. 98-2).  Plaintiffs submitted the exhibit and no party challenged its inclusion in the summary judgment record.  All parties cite to the document in the CSMFs.    The court will consider the hearsay statements in the document because the declarants could be called as witnesses at trial.  *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016).

the SHU was reviewed and reduced based on his compliant behavior.  On September 16, 2015,

his release date was adjusted to September 27, 2015.  (Pl. Ex. 9, ECF No. 98-1).

While in the SHU, the WCCF staff continued nightly to administer Doxepin to Michaux.

(ECF No. 110 ¶ 52).  On September 24, 2015, Nurse Spraggs delivered to Michaux his

medication and recounted that Michaux was pleasant and joking with the inmate in the next cell

and the corrections officer.  (Pl. Ex. 12, ECF No. 98-1).  Michaux took his medications as usual

and gave no indication of displeasure or distress.  *Id.*  On September 25, 2015, at approximately

9:00 p.m., Nurse Fischer administered to Michaux his medication.  She recounted that Michaux

was pleasant and courteous as always and confirmed that he was taking his medications.  He

laughed at the nurse's conversation with the inmate in the next cell.  His behavior was calm and

cooperative.  *Id.*

Approximately four hours later, on September 26, 2015, at 12:55 a.m., a nurse was

summoned to the SHU for medical support after Michaux was found by a corrections officer.  A

cut sheet was around Michaux's neck and he was hanging from the air vent.  CPR was initiated,

but was unsuccessful.  *Id.*

### 5.  Michaux's Journal

After Michaux's suicide, corrections officers recovered an undated, 104-page journal and a

4-page suicide note handwritten by Michaux (Pl. Ex. 18, ECF Nos. 98-2, 98-3).  Dr. Daniel

recognized in his expert report that jail staff do not customarily read an inmate's writings except

when there is a security or escape risk.  (Daniel Report ¶ 11, ECF No. 98-4).  Dr. Daniel agreed

in his deposition that Michaux expressed suicidal ideation only by writing in his personal

journal.  Daniel Deposition at 36, 42 (ECF No. 98-5).  No one knows when Michaux wrote in his

journal or when his suicidal ideation began.  Daniel Deposition at 34 ("Q: So you don't know if

on or about August 19th he had started writing that journal yet?  A:  I don't know.") (ECF No. 98-5).

There is no evidence that any named defendant ever read the journal prior to Michaux's suicide.  Daniel Deposition at 78 (ECF No. 98-5).  The only evidence presented by plaintiffs is a copy of the notes of a November 6, 2015 interview of Captain William Cramer ("Cramer"), in which Cramer told investigators:  "During cell inspections, Officers check the cell for contraband.  They do not usually read all of the writings of an inmate.  Captain Cramer stated Officers do not have time to completely shake down each inmate's cell.  The Officers usually scroll through extensive amounts of writing when found."  (ECF No. 98-2 at 25).  Cramer told investigators that a cell inspection and security check had been performed approximately one hour prior to Michaux's suicide, no contraband was found, and the inspection did not warrant a full shakedown.  (Pl. Ex. 17, ECF No. 98-2).

In the *Daubert* opinion, the court precluded Dr. Daniel from offering expert testimony about whether the corrections officers had a duty to read the journal.  The court concluded that Dr. Daniel was not qualified to opine on that subject because he had no knowledge about or experience in supervising corrections staff.  The court concluded there was no evidentiary basis, other than speculation in hindsight, for any individual defendant to have read Michaux's journal. (ECF No. 82).

### 6.  Scheduling of Follow-up Appointment

On May 28, 2015, Dr. Kolli ordered a 12-week follow-up appointment with Michaux. Twelve weeks would have been mid-August, around the time that Michaux was placed in the SHU.  There is no evidence that Michaux's suicidal condition was present in August 2019, when he was placed in the SHU.

The follow-up appointment never occurred.  Instead, Michaux's appointment was postponed to the next week approximately 6 times; in other words, for approximately 6 weeks.  No individualized assessment of Michaux's condition was performed by Hepple or McGavitt before his appointments were postponed (ECF No. 110 ¶ 41(u)).

Temas was asked in his deposition whose responsibility it was to ensure that a follow-up appointment with the psychiatrist actually took place.  He answered:  "I am not sure.  Maybe Mrs. McGavitt.  Mrs. Hepple could have coordinated that.  Either one of them."  Temas Deposition at 42-43, 54 (ECF No. 98-4).  Temas did not know anyone else who would be involved.  *Id.*

Hepple testified it was not her obligation to schedule the follow-up appointment.  Hepple Deposition at 29.  There was a running log book and sometimes Hepple and sometimes McGavitt would go through the book and prioritize who would have an appointment with Dr. Kolli.  *Id*. at 26, 29.  Corrections officers could make a referral, but Hepple or McGavitt would note in the log book the names of the inmates that needed to be seen by Dr. Kolli the following week or when the next appointment should be scheduled.  *Id*. at 30.  The named defendants describe this process as triaging.  (ECF No. 110 ¶ 41(u); ECF No. 111 ¶ 83).

 Hepple testified that if a patient was stable, there would be a 12-week follow-up, but if there were problems, Dr. Kolli would see them sooner.  Hepple Deposition at 26.  Problems would be brought to her attention by a corrections officer contacting the charge nurse or an inmate submitting a sick-call slip.  *Id*. at 26-27.

McGavitt was interviewed by investigators on November 12, 2015.  She explained that Michaux's follow-up appointment did not occur because they were "so backed up" on psychiatric cases.  (Pl. Ex. 16).  Hepple worked at the WCCF for only 4 hours on Tuesdays

(Hepple Deposition at 18) and Dr. Kolli worked at the WCCF only on Thursdays.  There were too many psychiatric cases for Dr. Kolli to handle each week in light of his one day per week schedule.  (Pl. Ex. 16).

Visits were prioritized according to urgency and need.  Dr. Kolli determined how soon a follow-up visit would occur.  A 12-week follow-up indicated an inmate was a very low suicide risk.  McGavitt Deposition at 42.  If an inmate's appointment was delayed because another inmate had higher priority, the inmate would be scheduled the next week and so on until he was seen.  *Id*. at 51.  Michaux was deemed a low priority as far as urgency.  *Id*. at 45. McGavitt testified that she knew, as a fact, that Michaux's name was put on the schedule for the next week, i.e., Dr. Kolli's next visit after Michaux's suicide.  *Id*. at 52.

### 7.  The risk factors identified by plaintiffs

Plaintiffs contend that Michaux exhibited 14 suicide risk factors. The risk factors cited by plaintiffs are: (1) a recent suicide attempt;[10] (2) history of mental illness; (3) depression; (4) hallucinations and delusions; (5) paranoia; (6) being prescribed Doxepin, a depression medication; (7) anxiety and agitation; (8) isolation; (9) sleep disturbance; (10) placement in the SHU; (11) incarceration for a violent crime; (12) prior suicide attempt in the same facility; (13) placement in the SHU for fighting; and (14) history of opioid dependence. (ECF No. 110 ¶ 30).

### IV.   Legal Analysis

#### A.  Admissibility of Michaux's Journal

---

[10] Michaux's prior attempt was more than a year earlier.  (Ex. D-T, ECF No. 108).

There is one important evidentiary dispute about the summary judgment record that must be resolved.  Plaintiffs seek to introduce into evidence an undated "journal" that Michaux created while in the SHU. (Pl. Ex. 18).  Plaintiffs' theory of the case is largely dependent upon the evidence of suicidality that is apparent from reading the journal entries.  Defendants contend that the journal is not admissible.  Plaintiffs did not provide any citations to decisional law.  As more fully discussed below, the court concludes, from its independent legal research on decisions that have addressed the use of personal journals or diaries at the summary judgment stage, that the journal cannot be considered.

### 1. Hearsay

All named defendants contend that the journal is inadmissible hearsay.  "Hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*."  *Fraternal Order of Police,* 842 F.3d at 238 (emphasis in original).  The burden is on the party offering the evidence (in this case, plaintiffs) to show how the journal would be admissible.  *Id*. at 238-39.

In *Gilmore v. Federated Department Stores, Inc.*, No. CIV. 06-3020(JBS), 2008 WL 687260, at *2 (D.N.J. Mar. 11, 2008), the plaintiff submitted as evidence in opposition to a defendant's summary judgment motion numerous handwritten pages of personal notes that she took over the course of her employment and sought to use the notes as evidence that the events referenced in the notes took place. The court concluded that to the extent the plaintiff relied on the diary notes to prove the truth of the matters asserted pursuant to Federal Rule of Evidence 801(c), they were inadmissible hearsay.  The court explained that it would not consider the contents of the plaintiff's notes.  It concluded that hearsay statements not capable of being admissible at trial cannot be considered on a motion for summary judgment. *Id*. at *2 n.3 (citing *Philbin v. Trans*

*Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir. 1996)).  In *Godwin v. Wellstar Health Systems, Inc.*, No. 1:12-CV-3752-WSD, 2016 WL 901294, at *1 (N.D. Ga. Mar. 3, 2016), the court explained that a diary is not admissible as hearsay, because it is an out-of-court statement offered to prove the truth of the matters asserted in the diary.  The court explained that a diary's author had the opportunity to write down whatever she wanted when she made her diary entries and they were not spontaneous utterances, but were the rendition of events that she chose to put down on paper.  *Id.*  In *Godwin*, the court rejected admission of the diary under the Rule 803(1) and (3) exceptions.  *Id*.

Plaintiffs seek to use the journal to prove the truth of numerous facts stated therein, including that Michaux was suicidal throughout his stay in the SHU, he attempted to commit suicide numerous times, he exchanged ripped bedsheets, and he left the bedsheets hanging from the vent in his cell in full view of corrections officers.  Plaintiffs seek to admit the journal under several exceptions to the hearsay rule, i.e., Federal Rules of Evidence 803(1), (2) and (3) and 804(2). Each of the evidentiary rules cited by plaintiffs will be discussed.

> a.  Rule 803

Rule 803 provides, in relevant part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (1) Present Sense Impression. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.
>
> (2) Excited Utterance. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.
>
> (3) Then-Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact

remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803.

> i.   Rule 803(1)

There are three requirements which must be met before hearsay evidence may be admitted as a present sense impression under Rule 803(1): (1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event, rather than a narration; and (3) the declaration and the event described must be contemporaneous.  *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998) (anonymous note not admissible).  In *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 303 (3d Cir. 1983), rev'd on other grounds, *sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the court refused to consider a diary created shortly after certain meetings as part of the summary judgment record and explained that Rule 803(1) requires, in addition to contemporaneity, there be some corroborating testimony about reliability.

In this case, there is no independent evidence in the record to corroborate that the journal entries accurately recounted actual suicide attempts, rather than cathartic self-reflection or introspection by Michaux.  For example, plaintiffs did not develop any evidence of torn sheets discovered in the prison laundry or during the weekly sheet exchange or obtain testimony from corrections officers or other inmates about the journal's depiction of prior suicide attempts.[11] The Rule 803(1) exception will not apply.

---

[11] Plaintiffs' exhibit 14 consists of four photographs taken after the suicide (Bates labels WASH 129, 130, 137, 138, ECF Nos. 98-1, 98-2), which were produced in defendants' initial disclosures on May 11, 2018 (ECF No. 68).  The photographs depict the bedsheet Michaux used to kill himself secured to the vent in Michaux's cell.  (ECF No. 111 ¶ 59 and responses thereto). Temas testified that the bedsheet was visible through the window in Michaux's cell door.  *Id.* Plaintiffs do not cite to anything, other than Michaux's journal, as evidence that bedsheets were visible in Michaux's cell after previous suicide attempts described in the journal. *Id.*  There is no

ii.      Rule 803(2)

The requirements for a hearsay statement to constitute an excited utterance under Rule

803(2) are: (1) a startling occasion, (2) a statement relating to the circumstances of the startling

occasion, (3) a declarant who appears to have had opportunity to observe personally the events,

and (4) a statement made before there has been time to reflect and fabricate.  *Mitchell*, 145 F.3d

at 576.  As explained in *Godwin*, a diary does not qualify as an excited utterance, because it

reflects the rendition of events that the author later chose to put down on paper.  2016 WL

901294, at *1.  Michaux's journal is lengthy and appears to have been compiled over many days.

It is not an excited utterance.  The Rule 803(2) exception will not apply.

iii.      Rule 803(3)

In *Stelwagon Manufacturing. Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1274 (3d

Cir. 1995), the court held that statements cannot be considered under the "state of mind"

exception set forth in Federal Rule of Evidence 803(3) to prove the truth of the underlying facts

asserted.  In *Jenks v. Naples Community Hospital, Inc*., 829 F. Supp. 2d 1235 (M.D. Fla. 2011),

the court refused to consider the diary of an employee who subsequently died as part of the

summary judgment record of an employment discrimination case, except for one comment that

reflected her supervisor's state of mind under Rule 803(3).  As in *Jenks*, it is the relevant

defendant's state of mind that is important in this case.  The question is not whether Michaux

was suicidal, but whether a defendant was deliberately indifferent to his risk for suicide.  The

journal shows Michaux's state of mind, but plaintiffs did not point to any statements in the

journal that reflect any defendant's state of mind.  Instead, plaintiffs seek to use the journal to

corroborating evidence that any corrections officer or medical staff ever saw a bedsheet hanging
from the vent in Michaux's cell prior to his suicide.

establish the truth of underlying facts (i.e., that Michaux engaged in numerous prior suicide

attempts while in the SHU) and to ask the jury to infer a defendant's state of mind from his or

her failure to notice those attempts.  The journal is not admissible for that purpose under the state

of mind exception.  The Rule 803(3) exception will not apply.

> b.  Rule 804(b)(2)

Rule 804(b)(2) (Statement Under the Belief of Imminent Death) provides an exception to

the hearsay rule when the declarant is unavailable:

> (b)(2) In a prosecution for homicide or in a civil case, a statement that the
> declarant, while believing the declarant's death to be imminent, made about its
> cause or circumstances.

Fed. R. Evid. 804(b)(2).

The journal is not admissible under Rule 804(b)(2).  The majority of the undated journal

entries do not appear to have been made while Michaux's death was imminent, but were written

throughout his time in the SHU.  In addition, plaintiffs do not seek to use the journal to prove the

"cause or circumstances" of Michaux's death (which are undisputed), but for the different

purpose of proving that the named defendants were deliberately indifferent.  The Rule 804(b)(2)

exception will not apply.

### 2. Prejudice/Probative Value – Rule 403

Federal Rule of Evidence 403 provides that the "court may exclude relevant evidence if

its probative value is substantially outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Even assuming, for the sake of

argument, that the journal was admissible under one of the hearsay exceptions cited by plaintiffs, the court would be constrained to exclude the journal under Rule 403.

The probative value and reliability of the journal were not established by plaintiffs.  As explained above, there is no independent evidence in the record to corroborate that the journal entries accurately recounted actual suicide attempts.  Admission of the journal would cause unfair prejudice and confuse the issues.  There is no evidence that any named defendant read the journal or knew he or she had a duty to do so or knew he or she had a duty to direct others to do so.  In those circumstances, at best the issue might rise to the level of negligence, which is not sufficient for deliberate indifference.  *Palakovic*, 854 F.3d at 223-24.

In sum, the probative value of the journal would be substantially outweighed by the danger of unfair prejudice and confusion of the issues.   *Phillips v. Potter*, No. CIV.A. 7-815, 2009 WL 3271238, at *4 (W.D. Pa. Oct. 9, 2009) (excluding journal under Rule 403 where dangers of prejudice outweighed the probative value of journal entries); *accord Zenith Radio Corp. v. Matsushita Elec. Indus. Co*., 505 F. Supp. 1190, 1275 (E.D. Pa. 1980), rev'd in part on other grounds, *sub nom. In re Japanese Elec. Prod. Antitrust Litig*., 723 F.2d 238 (3d Cir. 1983), rev'd, *sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986) (same).


### 3. Conclusion about admissibility

In sum, because plaintiffs failed to meet their burden to demonstrate that the journal can be presented in an admissible form at trial, it will not be considered in ruling on the summary judgment motions.  Even assuming for the sake of argument the journal was admissible under one of the Rules of Evidence cited by plaintiffs, the court would be constrained to exclude the journal under Rule 403.

B.  Summary Judgment Standard

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita*, 475 U.S. at 586-87).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, must draw all reasonable inferences in favor of the non-moving party, and resolve all doubts in favor of the nonmoving party.  *Doe v. Cnty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

C. <u>Federal § 1983 Claims – Counts I and II</u>

   1. <u>General § 1983 Principles</u>

Section 1983 provides private citizens a right of action against

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws....

42 U.S.C. § 1983. Section 1983 does not create substantive rights; instead, it "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996).  To state a viable claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) the violation of a right secured by the Constitution and laws of the United States; and (2) the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).  In this case, there is no dispute that the named defendants acted under the color of state law.  Thus, the focus of the issues relates to whether there was a violation of Michaux's constitutional rights.

Prisoners have a constitutional right to be free from inhumane conditions of confinement.  *Id.* at 226.  One aspect of this right is that prison officials may not be deliberately indifferent to the serious medical needs of prisoners.  *Id.* at 222.  As the court explained in *Palakovic*, a "particular vulnerability to suicide" is one type of "serious medical need" to which prison officials may not be deliberately indifferent.  *Id.*

A convicted inmate's right to be free from cruel and unusual punishment is protected by the Eighth Amendment to the United States Constitution.  As a pretrial detainee, Michaux's right arises under the Fourteenth Amendment.  *Id.* at 222.  A pretrial detainee is entitled to "at least as

much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment." *Id.*

### 2. Count I

#### a. Summary of Substantive Law Regarding Prison Suicide

Count I asserts claims of deliberate indifference against all named defendants except Temas. Prison officials are not required to prevent an inmate from committing suicide. *Palakovic,* 854 F.3d at 222. On the other hand, if prison officials know or should know about the particular vulnerability to suicide of an inmate, then the United States Constitution imposes on them an obligation not to act with reckless indifference to that vulnerability. *Id.*

The elements of the prima facie case are: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability." *Id.* at 223-24.

The law requires a relatively high level of culpability on the part of prison officials before holding them accountable, *i.e.*, reckless or deliberate indifference to that "strong likelihood" of suicide. *Id.* Mere negligence will not suffice. *Id.* The risk of suicide must be "so obvious that a layperson would easily recognize the necessity for preventative action." *Palakovic*, 854 F.3d at 222. In this case, all the named individual defendants are laypersons,[12] in that they lack specialized training or expertise in identifying a suicide risk.

---

[12] Dr. Kolli, the prison psychiatrist, is not named as a defendant.

Deliberate indifference requires a subjective state of mind that can be proven through circumstantial evidence and witness testimony. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). The "mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Id.*

b.  Application to this Case

i.  Prong 1:  Particular Vulnerability to Suicide

No reasonable jury could find that plaintiffs are able to satisfy the first prong of a deliberate indifference claim. Other than the inadmissible journal, there is no evidence that Michaux outwardly demonstrated any particular vulnerability to suicide during the times at issue.

In *Palakovic*, an inmate was alleged to be particularly vulnerable to suicide where he had a long history of mental health issues and prior suicide attempts, told staff of a prior prison he made plans to kill himself, was nicknamed "Suicide" by the other prisoners, and was recognized as a "suicide behavior risk" by prison officials. 854 F.3d at 216. By contrast, in *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005), the court held that the plaintiffs failed to establish "particular vulnerability" where the inmate was in good spirits, was talking and joking with arresting officers upon arrival at the county jail, denied being suicidal, and was described as polite, cooperative, alert and not agitated in an intake medical assessment, even though the intake officer also observed that the decedent expressed remorse, seemed distant, was unresponsive to questions, suggested that he had failed as a father and a person, and indicated that he was intoxicated and had been on a 24-hour drug and alcohol binge. *Id.* at 321-23.

The factual record in this case shows less vulnerability to suicide than in *Woloszyn*.  Michaux repeatedly denied suicidal ideation, most recently in his May 28, 2015 evaluation by Dr. Kolli. Michaux did not submit any additional sick call requests after April 2015.  He was apparently friendly, cooperative and compliant in taking his medication, even hours prior to his suicide.  (Pl. Ex. 12, ECF No. 98-1).  Plaintiffs' expert, Dr. Daniel, agreed in his deposition that Michaux expressed suicidal ideation only by writing in his personal journal.  Daniel Deposition at 36, 42 (ECF No. 98-5).

### ii.   Prong 2:  Knew or Should Have Known

Even if the journal was admissible into evidence, the facts of record show that plaintiffs could not satisfy the second prong of a deliberate indifference claim.  There is no evidence that any of the defendants named in Count I knew or should have known about the journal entries.

Plaintiffs cannot satisfy this prong of the prima facie case by pointing to generic risk factors. Plaintiffs concede that none of the named defendants had any actual knowledge that Michaux would commit suicide.  Instead, plaintiffs argue that defendants "should have known" about his particular vulnerability.  (ECF No. 105 at 6) ("The standard is known or **should have known**") (emphasis in original).  Plaintiffs argue that defendants knew about or should have been aware that Michaux exhibited 14 itemized suicide risk factors.  (ECF Nos. 95 at 14-18, 105 at 9-11).

In *Estate of Thomas v. Fayette County*, 194 F. Supp. 3d 358, 373 (W.D. Pa. 2016), the court rejected reliance on generic risk factors.  In *Thomas*, similar to the risk factors identified in this case, the plaintiffs argued that the inmate had "a particular vulnerability to suicide because he had a history of mental illness, depression, and a prior suicide attempt, used a substantial quantity of drugs prior to being detained, exhibited mood swings and was belligerent with the Prison staff, and was suffering from drug withdrawal symptoms."  *Id*. at 375.  The court held that

to establish a particular vulnerability to suicide, the evidence must establish that "the **particular individual**, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide." *Id.* at 376 (emphasis added) (citing *Wargo v. Schuylkill Cty.*, No. 06-2156, 2008 WL 4922471 (M.D. Pa. Nov. 14, 2008), aff'd, 348 F. App'x 756 (3d Cir. 2009) ("Plaintiff has produced no evidence that [the plaintiff] himself represented the suicide risk that would create liability for the prison, and the court cannot ascribe to him a particular vulnerability based on broad social and demographic characteristics.").  The court explained in *Thomas*:

> there is a sound, pragmatic reason for the law to not quickly make such a logical jump. Were the law to impose liability upon a prison (or its officials) whenever there was any possibility for suicide (perhaps because of the presence of some recognized or presumed suicide correlates), prisons could be led to place any individual showing or suspected of having such suicide correlates into suicide watch, resulting in severe restrictions on a prisoner's liberty interests.

*Id.* at 377 n.18; *accord Nealman v. Maben*, No. 1:15-CV-1579, 2019 WL 4781348, at *5 (M.D. Pa. Sept. 30, 2019) (if demographic correlates were enough, any male arrested and detained for a crime would be deemed a suicide risk).

The court of appeals stated in *Wargo*: "It is not enough to show that the detainee fits within a category of persons who may be more likely to commit suicide. Instead, [the plaintiff] has the burden of demonstrating that [the decedent] had a particular vulnerability to suicide." *Wargo*, 348 F. App'x at 759.  The court emphasized:  "It is the *individual factors*, not group characteristics, which are important in considering whether the person had a particular vulnerability to suicide."  *Id.* (emphasis in original).  In sum, plaintiffs cannot succeed by listing generic risk factors – instead, they must introduce evidence that the individual named defendants knew or should have known that Michaux exhibited a substantial risk of suicide.  As discussed above, there is no such evidence in this record.

In particular, there is a lack of evidence with respect to corrections officer defendants Smith and Gray, against whom Plaintiffs did not withdraw their claims.  Smith was not on duty the night Michaux committed suicide.  (Smith Deposition at 17, ECF No. 98-4).  Gray was in a different part of the facility that night, i.e., the work release area on levels 1 and 2, and responded to a call for support after Michaux's suicide was discovered.  (Gray Deposition at 9, ECF No. 90-14).

Plaintiffs do not point to any evidence that Smith or Gray actually knew that Michaux was suicidal.  There is no evidence that Smith or Gray observed prior suicide attempts by Michaux in the SHU,[13] found torn sheets, saw sheets hanging from the vent, or read Michaux's journal.  Instead, plaintiffs argue that Smith and Gray should have known about Michaux's risk of suicide because: (1) they should have seen hanging sheets from prior suicide attempts, as documented in the journal; (2) Smith should have seen the torn sheets during the bi-weekly sheet exchange; and (3) they should have read Michaux's journal.

There is no evidence in the record (other than the journal) that Michaux engaged in any prior suicide attempts while in the SHU in August and September 2015.[14]  In addition, there is no evidence that Smith or Gray observed torn sheets during the sheet exchange.[15]  As the court explained above, the journal is inadmissible hearsay or is inadmissible under Federal Rule of Evidence 403 and will not be considered as evidence in the summary judgment record.

No reasonable jury could find prong 2 to be satisfied with respect to any defendant named in Count I.

---

[13] Smith testified that he was not aware of any prior suicide attempts.  (Smith Deposition at 45, ECF No. 98-4).

[14] Plaintiffs' expert, Dr. Daniel, acknowledged this fact in his deposition.  Dr. Daniel's opinion that Michaux was obviously suicidal was based exclusively on the contents of his journal. Daniel Deposition at 36 (ECF No. 98-5). Dr. Daniel conceded that Michaux only expressed suicidal ideation in the writings themselves. *Id.* at 42.

[15] Plaintiffs seek to establish the "fact" of torn bed sheets only by reference to the journal.

iii.   <u>Prong 3:  Deliberate Indifference</u>

The only named defendants plaintiffs make specific allegations about being deliberately indifferent are Hepple and McGavitt. Plaintiffs' theory against both Hepple and McGavitt is that postponing the follow-up appointment constituted deliberate indifference to his risk of suicide.[16] (ECF Nos. 95, 105).  The court of appeals has explained that "the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 (3d Cir. 1991).

The liability of Hepple and McGavitt -- both nurses -- must be considered in light of the undisputed fact that Michaux was being treated by Dr. Kolli.  In *Pearson*, the court explained that nurses are entitled to assume that prison doctors are providing adequate care absent evidence that the doctor is mistreating (or not treating) the inmate: "Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' so long as the nurse has no discernable basis to question the physician's medical judgment."  850 F.3d at 540 n.4 (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *accord Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").  Plaintiffs' reliance on *Estate of Kempf v. Washington County*, No. CV 15-1125, 2018 WL 4354547, at *1 (W.D. Pa. Sept. 12, 2018) (deliberate indifference to suicide risk survived summary judgment),

---

[16] Plaintiffs did not develop evidence from which a jury could determine which nurse (if either) had a duty to make sure that Michaux's follow-up appointment occurred.  Because the court concludes that no reasonable jury could find Hepple or McGavitt liable, it need not resolve this issue.

is misplaced because in that case, the claims were asserted against Dr. Kolli, a psychiatrist, who was treating the inmate and is not considered to be a layperson.  Dr. Kolli is not named as a defendant in this case.

In *Pearson*, the court stated that to find deliberate indifference in a delay or denial of medical treatment claim, "[a]ll that is needed is for the surrounding circumstances to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors."  850 F.3d at 537. That statement, however, must be understood in context with the court's instruction that "a delay or denial of medical treatment claim must be approached differently than an adequacy of care claim."  *Id*.  The court in *Pearson* recognized that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'"  *Id*. at 535 (citing *United States ex. rel. Walker v. Fayette Cty*., 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners.  *Durmer*, 991 F.2d at 67.  Allegations of mere negligent treatment or even medical malpractice do not trigger the protections of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).  In *Palakovic*, the court explained:

> Plaintiffs' theory does not satisfy the "deliberate indifference" standard. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (internal quotations and citation omitted). Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

*Palakovic*, 854 F.3d at 228.

This case does not involve a "complete delay or denial of care."  Although plaintiffs attempt to characterize the postponements of the follow-up appointment as a denial of care, it is undisputed that Michaux was receiving medical and psychiatric attention.  He was seen twice by Hepple and referred to Dr. Kolli, who prescribed Doxepin for Michaux and ordered a 12-week follow-up appointment.  Michaux was receiving his medication every evening and a nurse observed him shortly before his suicide.  McGavitt scheduled him to be seen by Dr. Kolli the next week when she postponed Michaux's appointment.

Plaintiffs argue that the delay in conducting the follow-up appointment was totally arbitrary and motivated by non-medical factors.  Examples of non-medical factors include a desire to punish, to lessen the workload or to save a prison money.  *Simmons v. Lanigan*, No. CV16-4215, 2019 WL 3336596, at *7 (D.N.J. July 25, 2019) (citing *Durmer*, 991 F.2d at 68–69).  The lack of an explanation for a treatment delay, however, does not necessarily mean that the delay was motivated by non-medical reasons. *Id.* (citing *Miller v. Steele-Smith,* 713 F. App'x 74, 80 (3d Cir. 2017)).

There is no evidence that the postponement in this case was based on non-medical factors.  There is no evidence that either Hepple or McGavitt harbored any animus towards Michaux, was attempting to shirk her workload, or was attempting to avoid costly treatment.  It is undisputed that Dr. Kolli had limited availability and the nurses prioritized who got to see him based on the perceived urgency and risk of each inmate.  The record is undisputed that Hepple or McGavitt postponed Michaux's appointment because he was considered to be low risk based upon Dr. Kolli's opinion that a 12-week follow-up was appropriate.  (CSMF ¶ 77(o)).  Although Dr. Kolli's examination occurred several months earlier, there is no evidence (other than the

inadmissible journal) that Michaux's mental condition had changed since he was seen by Dr. Kolli or that Hepple or McGavitt was aware Michaux posed a substantial risk of serious harm.

Michaux did not submit any requests to be seen after April 2015 and there were no adverse behavioral reports from the corrections officers submitted to Hepple or McGavitt.  They had no reason to know that Michaux needed urgent attention.  Under the facts adduced, no reasonable jury could find that Hepple or McGavitt delayed or denied obviously necessary medical treatment for non-medical reasons.

In the most analogous situation in *Pearson*, the court held that a prison nurse, in the absence of evidence that the seriousness of the harm was communicated to her, was not liable as a matter of law for a delay in responding to post-surgery bleeding because the inmate was under the care of a doctor.  *Pearson*, 850 F.3d at 539-40.  In *Pearson*, the court did find a basis for deliberate indifference by a different nurse where that nurse (1) refused to examine an inmate in his cell when the block officer called medical, (2) forced the inmate to crawl to a wheelchair while screaming in pain, and (3) only ordered the inmate to be placed in the infirmary overnight, despite recognizing signs of appendicitis.  *Id.* at 541.

In *Palakovic*, the court recognized a deliberate indifference claim was pleaded where the prison ignored an inmate's requests to be seen by the psychiatrist, the inmate reported that the medication was ineffective, and the chief psychologist "expressly prohibited medical personnel from speaking with mentally ill prisoners in solitary confinement," except for one or two minutes through steel doors.  *Id.* at 228.  The facts in this case are distinct from those in *Palakovic* in material respects.  Michaux did receive an examination by the prison psychiatrist, Dr. Kolli, who placed him on a medication for depression. Michaux never reported that the medication was

ineffective.  Michaux denied suicidal ideation.  Michaux knew how to submit sick call requests and Hepple responded to both requests he submitted.

The essence of plaintiffs' theory is that McGavitt or Hepple should have reviewed Michaux's medical record or performed an individualized assessment before postponing his appointment.[17] (ECF No. 95 at 11; ECF No. 105 at 5).  A failure to obtain additional information might implicate negligence, but does not constitute deliberate indifference.  *See Estate of Kempf v. Washington Cty.*, No. CV 15-1125, 2018 WL 4354547, at *17 (W.D. Pa. Sept. 12, 2018) (contention that a jail medical official should have ordered additional observation is a disagreement about proper medical treatment that does not rise to a constitutional violation) (citing *Pearson*, 850 F.3d at 543).

Perhaps the most factually similar case is *Estate of Lewis v. Cumberland County*, No. 16-3503, 2019 WL 7047220 (D.N.J. Dec. 23, 2019) (granting summary judgment to a nurse).   In that case, the inmate reported a suicide attempt and heroin issues during a stint at the jail two months earlier.  During the mental health intake screening for his new admission, the inmate denied having any suicide risk factors and appeared alert, neat, and appropriate.  He was not placed under enhanced scrutiny, but tragically took his life two days after his intake.  *Id*. at *1. The inmate's estate argued that the nurse was deliberately indifferent for failing to review his medical record or examine his wrists.  The court held that "while the failure to review Mr. Lewis' medical history or check his wrists may amount to negligence, it does not amount to a § 1983 claim for deliberate indifference." *Id*. at *10; *accord Thomas*, 194 F. Supp.3d at 172-73 ("Nurse DeLorenzo did not refuse to provide required medical treatment without reason or prevent Mr. Thomas from receiving recommended medical treatment; instead she concluded—

---

[17] Plaintiffs emphasize that Michaux's appointment was postponed six times, but do not specify when the duty to perform an individualized assessment would have been triggered.  There is no expert testimony about this issue.

consistent with Prison medical policy—that no medical treatment was necessary or even available. This is not deliberate indifference.");  *see Goodrich v. Clinton Cty. Prison*, 214 F. App'x 105, 112 (3d Cir. 2007) (granting summary judgment to a mental health counselor who met with an inmate, but refused to refer him to psychiatrist for medication).

In sum, a reasonable jury could not conclude that Hepple or McGavitt acted with deliberate indifference or knew or should have known that Michaux was particularly vulnerable to suicide.

### iv.  Summary

For the reasons set forth above, no reasonable jury could find in favor of plaintiffs with respect to Count I and summary judgment must be entered in favor of all defendants named in Count I.

### D.  Count II – only asserted against Warden Temas

In Count II, plaintiffs assert supervisory liability claims and municipal liability claims, i.e., "*Monell* claims."  Temas is the only defendant named in Count II.  Plaintiffs did not articulate separate theories of supervisory and municipal liability; their legal arguments are identical for all claims against Temas (ECF No. 105 at 17-19).  The court will address the theories separately because Temas was named as a defendant in both his individual and official capacities.

### 1.  Supervisory liability legal principles – individual capacity

To succeed on a § 1983 claim against a supervisor based on prison policy or practices, plaintiffs must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor

was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

In *Thomas*, the court described the test as follows:

For prison suicide cases, specifically, "the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Woloszyn*, 396 F.3d at 325. **And supervisory liability requires deliberate indifference on the part of the supervisor as well**. *Brown v. Muhlenberg Twp*., 269 F.3d at 216. (noting that supervisory liability requires a showing that the existing custom or practice—without the unenforced or absent procedure— "created an unreasonable risk of the ultimate injury," that "the supervisor was aware that this unreasonable risk existed," and that "the supervisor was indifferent to the risk.").

194 F. Supp.3d at 383 (emphasis added).

> 2. Municipal liability legal principles (*Monell* claims) – official capacity

The legal principles governing a *Monell* claim were recently summarized as follows:

Municipalities and other local governments are "persons" for Section 1983 purposes, *Monell v. Dep't of Social Servs*., 436 U.S. 658, 690 (1978), but such entities are not responsible for every constitutional tort committed by their employees, *see Connick v. Thompson*, 563 U.S. 51, 60 (2011). To bring a Section 1983 claim against a municipality, a plaintiff "must show that they were deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and that the deprivation of those rights was the result of an official government policy or custom." *Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 (3d Cir. 2013). The Third Circuit has explained that, for municipal liability to attach, the plaintiff must establish that the municipal policy or custom was itself unconstitutional or was the "moving force" behind the constitutional deprivation. *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted). When a challenged policy or custom is not facially unconstitutional, a plaintiff can meet the causation requirement "only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences"—"[a] showing of simple or even heightened negligence will not suffice." *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

> A plaintiff may bring a policy-based *Monell* claim for an alleged failure to train employees. *Thomas*, 749 F.3d at 222. A failure-to-train claim requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will encounter the untrained employees. *See id.* (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). This standard is demanding—it requires evidence that the municipality "disregarded a known or obvious consequence" of its deficient training program. *Connick*, 563 U.S. at 61 (quoting *Brown*, 520 U.S. at 410). The alleged training deficiency must be closely related to the constitutional injury suffered by the plaintiff. *Id.*

*McCracken v. Fulton Cty.*, No. 3:19-CV-1063, 2020 WL 2767577, at *8 (M.D. Pa. May 28, 2020).  The United States Supreme Court has also explained that there can be no supervisory liability or *Monell* liability if there is no underlying constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

### 3.  Supervisory liability – application

The court turns now to the supervisory liability theories advanced by plaintiffs in this case.  At the *Daubert* stage, the gravamen of Dr. Daniel's expert opinion was that Michaux's suicide was caused by systemic failures, rather than the failures or actions of any individual.  The precise contours of the alleged systemic failures were not clear.  During the *Daubert* hearing, the court expressed confusion about the actual theory of the case and commented that Dr. Daniel's opinions would cause confusion for the jury, particularly in light of the difficult standard to show that a layperson such as Temas was deliberately indifferent to Michaux's suicide risk.  (Tr. 26-27, ECF No. 64).  Plaintiffs' counsel responded that he was asserting failure to train claims regarding: (1) the initial intake suicide screening, (2) the communications between the medical staff and corrections staff, and (3) the reading of an inmate's journal if the inmate is in the SHU. Tr. 46.

The failure to train claims now being asserted in plaintiffs' response to summary judgment are different.  Plaintiffs' primary argument is that Temas permitted McGavitt to

misunderstand the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d et seq.  (ECF No. 105 at 17-19; ECF No. 111 ¶ 81(f),(g) and responses thereto).  Plaintiffs assert there was no policy to ensure communication of suicide risks by the medical staff to the corrections staff.

> a. Initial Screening and Failure to Read Inmate Writings Theories

To the extent that plaintiffs continue to assert the failure to train theories articulated at the *Daubert* hearing, the court will summarily grant summary judgment in favor of Temas on theories (1) and (3).  In this case, no reasonable jury could find that the initial screening procedures causally impacted whether Michaux's suicide would have occurred.  In the six months after his initial screening, Michaux met twice with Hepple, was examined by the psychiatrist, Dr. Kolli, and placed on medication for depression.  He was in a fight with another inmate and placed in the SHU.  Whatever errors occurred during the intake screening in March 2015, no reasonable jury could find a causal relationship to Michaux's suicide six months later.

The failure to train theory about reading inmates' journals must fail for lack of evidence.  There is nothing in the record to establish that corrections officers should have been trained to read Michaux's writings.  As explained above, Dr. Daniel is precluded from offering that kind of opinion testimony because he lacks the proper qualifications and there is no evidence about what proper training should have been provided.

> b. HIPAA Theory

Plaintiffs' allegations with respect to a failure to train about communications between the medical staff and corrections staff require further analysis.  The theory, as presented in plaintiffs' summary judgment submissions, is that Temas permitted a fundamental misunderstanding of

HIPAA by McGavitt to exist, such that medical personnel failed to share important suicide risk information with the corrections officers.  (ECF No. 105 at 17-18; ECF No. 111 ¶ 81(f),(g)).

There is no evidence in the underlying record that McGavitt or any medical staff refused to share information with the corrections staff that Michaux was at risk of suicide.  There is no evidence that McGavitt possessed any information that Michaux was at risk for suicide.  Plaintiffs base their entire argument about a policy misapplication of HIPAA on the following passage from McGavitt's deposition testimony:

> Q: Would it ever happen that a correctional officer on a housing unit would contact medical and say, "This inmate who is on my pod met with the psychiatrist three days ago.  I want to know what happened?"
>
> A: That's not information for the correctional officer to be aware of.  That would be privileged, HIPAA-protected information, specific information.  He can contact the medical department and ask questions or relate concerns, but we won't give them medical information.

McGavitt Deposition at 30.  McGavitt's response to a deposition question is too thin a reed to create a jury question for a failure to train claim against Temas.  As reflected in the deposition transcript, the counsel's question is hypothetical and does not involve the facts of this case.  The question does not reflect any need for the medical information to be shared with the corrections staff.  Most notably, in the context of this case, the hypothetical question does not incorporate a concern about an inmate's risk for suicide.

The court agrees with plaintiffs that HIPAA expressly permits the sharing of medical information if there is a risk of suicide.  This district court has explained:

> Obviously, a failure to communicate that an inmate was to be on suicide watch would frustrate efforts to prevent that inmate's suicide. The Court will not countenance Defendants' citation to HIPAA as a justification for their refusal to fully communicate Stevens' risk of suicide.  As the Magistrate Judge aptly explained, HIPAA contains an exception which specifically permits use of such medical information by correctional institutions to protect the health and safety of inmates. R & R at 39–41; 45 C.F.R. § 164.512(k)(5).

*Ferencz v. Medlock*, No. CIV.A. 11-1130, 2014 WL 3339639, at *5 (W.D. Pa. July 8, 2014).

There is, however, no evidence of a similar failing in this case.  Michaux was not placed on a

suicide watch by the medical staff.  There is no evidence of any information about Michaux's

suicide risk that McGavitt, Hepple or Dr. Kolli failed to communicate with the corrections staff.

Even if McGavitt misunderstood the HIPAA, there is no basis for a reasonable jury to conclude

that a policy failure to train medical staff about the communication of medical information with

the corrections staff was causally related to Michaux's suicide.  *See Thomas*, 184 F. Supp.3d at

384 (policy of not considering medical records did not cause suicide).

> c.   Individual assessment before postponing appointment theory

Plaintiffs argue that defendants, particularly Hepple and McGavitt, erred by failing to

make a personalized assessment of Michaux's mental health condition before postponing his

appointment numerous times.  (ECF Nos. 95 at 4; 105 at 5).  Plaintiffs point to the accrual of

numerous suicide risk factors in Michaux's life after Dr. Kolli's examination of Michaux in May

2015, including Michaux's being prescribed Doxepin, his fight with another inmate and, most

notably, his placement in the SHU.[18]  (ECF No. 95 at 3-4).  In the interest of thoroughness, the

court will consider whether this theory supports a systemic failure-to-train claim.

Courts recognize the mental health dangers when inmates are confined in segregated

housing for lengthy periods of time.  Lengthy exposure to solitary confinement can violate the

Eighth Amendment because it can cause "severe and traumatic psychological damage, including

anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a

disintegration of the basic sense of self identity . . . [and] high rates of suicide and self-

---

[18] The court also notes from the record that Michaux's trial on the aggravated assault charges was scheduled to begin a few days after his suicide. (ECF No. 91-4 at 27).

mutilation." *Palakovic,* 854 F.3d at 225–26 (recognizing the "increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health"); *Williams v. Sect. of the Pa. Dept. of Corr.*, 848 F.3d 549 (3d Cir. 2017) (observing "growing consensus" about dangers of solitary confinement).[19]  The dangers of solitary confinement are particularly acute when an inmate has a history of mental health issues.  *Palakovic*, 854 F.3d at 225, 229 (plaintiff stated viable claims for inhumane conditions of confinement and improper medical care where inmate with mental illness and history of self-harm was repeatedly placed in solitary confinement).  It may well be that the medical staff were negligent in failing to consider the effects of Michaux's stint in the SHU before postponing his appointment with Dr. Kolli. Negligence, however, does not constitute deliberate indifference.  *Id.* at 223-24.

A failure to train theory about individually assessing inmates before postponing their appointments is not pleaded in the third amended complaint, *see* ¶¶ 59-60.  Plaintiffs' post-*Daubert* hearing "clarifications" did not articulate this theory.  (ECF Nos. 63, 75).  There is also no opinion testimony to support a claim regarding a failure to perform a personalized mental health assessment prior to postponing an appointment.  Dr. Daniel did opine in his report that Michaux was improperly placed in a segregated cell.  (Daniel Report ¶ 10, ECF No. 98-4).  In his deposition, Dr. Daniel explained that mentally ill patients should not be placed in segregation, particularly for a minor infraction like fighting, and should not be kept there for almost 60 days. Daniel Deposition at 35 (ECF No. 98-5).  None of the named defendants, however, were involved in placing Michaux in the SHU.  Because there was no claim asserted in the complaint about placement in the SHU, the court held that the opinions of Dr. Daniel about the SHU would not be permitted because they do not "fit" the claims asserted in this case.  (ECF No. 82).  Dr. Daniel did not opine about a systemic failure in considering Michaux's placement in the SHU

---

[19] These decisions were issued after Michaux's suicide in 2015.

before postponing his follow-up appointment.  This argument is presented for the first time in the summary judgment briefing, but is not supported by the evidentiary record.  No reasonable jury could find in favor of plaintiffs' on a failure to train theory based on the postponement of Michaux's follow-up appointments.

   d.   Lack of evidence of deliberate indifference by Temas

In the *Daubert* opinion, the court explained that its decision that Dr. Daniel would be permitted to offer opinions about certain systemic flaws was without prejudice to defendants' ability to file summary judgment motions regarding the viability of these claims. (ECF No. 82 at 24 n.7).  The court cited *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000), for the proposition that a failure to train claim "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Id.* at 276 (citing *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404 (1997). The court also cited *Robinson v. Fair Acres Geriatric Center*, 722 F. App'x 194 (3d Cir. 2018), in which the court stated:  "In order for a failure-to-train claim to support *Monell* liability, a plaintiff must show 'that in light of the duties assigned to [the relevant employees,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 199 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Plaintiffs did not address these flaws in their case, despite the court's cautionary note. There was no evidence of a pattern of prior suicides at the WCCF.  There had been one recent, previous suicide at WCCF, which was the subject of this court's decision in *Estate of Kempf*. There had been only one other suicide at the WCCF in the previous 20 years.  (Strawn

Deposition at 25, ECF No. 98-4).[20]   The gravamen of the claims in *Estate of Kempf* involved

deliberate indifference by Dr. Kolli, the treating psychiatrist.  Temas was originally named as a

defendant, but the court granted his motion to dismiss.  *Estate of Kempf*, 2018 WL 4354547, at

*2.  Dr. Kolli was not sued in this case and was not deposed.  There is no evidence that the

failures to train alleged by plaintiffs in this case were part of the same pattern implicated in

*Estate of Kempf*.[21]

In addition, plaintiffs failed to develop evidence from which a reasonable jury could

conclude that an alleged lack of training was obvious, that Temas was aware of the grave risk

posed by the failure to train, and disregarded the risk in a way that could constitute deliberate

indifference.  Plaintiffs admit that corrections officers at the WCCF underwent annual suicide

prevention training and that the WCCF's suicide prevention training always passed the

Pennsylvania Department of Corrections' annual inspection.  (ECF No. 111 ¶¶ 40, 41).

As discussed above, the gravamen of plaintiffs' failure to train theories involves an

alleged lack of communication from the medical staff to the corrections staff, and the failure of

the medical staff to perform an individualized assessment before postponing an appointment,

particularly when an inmate is placed in the SHU.  Plaintiffs, however, never specifically

identified what additional training should have been provided or how that training would have

prevented Michaux's death.   Dr. Daniel did not opine about national or state standards or

protocols about communication or assessment/postponement training by which Temas knew or

should have known that communication or assessment/postponement training in the WCCF was

---

[20] A third inmate committed suicide shortly after Michaux.  *Id.*

[21] Michaux's suicide cannot be construed as "a highly predictable consequence of a failure to
equip law enforcement officers with specific tools to handle recurring situations."  *Berg*, 261
F.3d at 276.  Although it is predictable that there may be suicides in prison, plaintiffs never
articulated what specific tool or training would have prevented Michaux's death.  To repeat,
there is no evidence adduced that the medical staff had any information that Michaux was
suicidal.

obviously faulty.  There is no evidence from which a reasonable jury could find that the risk

reduction associated with the proposed training was great and obvious.  There is no evidence

from which a reasonable jury could find that Temas was aware of an unreasonable risk caused by

the lack of communications or assessment/postponement training or was indifferent to that risk.

Even if a failure to train may have been negligent, the record falls far short of supporting a

finding of deliberate indifference by Temas.

### 4. *Monell* Claims- application

Plaintiffs' municipal liability theories are identical to their supervisory liability theories

(ECF No. 105 at 17-19).  Because no reasonable jury could find in favor of plaintiffs on their

claim of supervisory liability against Temas, for the reasons discussed above, it necessarily

follows that no reasonable jury could find *Monell* liability against the municipality.  *Mobley v.*

*City of Atl. City Police Dep't*, No. CIV.A.97-2086, 2000 WL 363692, at *6 n.2 (D.N.J. Mar. 30,

2000) (granting summary judgment to police department on *Monell* claim where supervisory

liability claim had been dismissed).  There is no evidence that there was a relevant municipal

policy or custom that caused the alleged constitutional violation.  *Natale v. Camden Cty. Corr.*

*Facility*, 318 F.3d 575, 584-85 (3d Cir. 2003) (describing situations where acts of employee may

be deemed to be the result of a policy or custom of the municipality).  In addition, there can be

no supervisory or municipal liability without underlying constitutional injury.  *Harris*, 489 U.S.

at 385.

### 5. Summary of supervisory liability and *Monell* claims

In summary, there is no evidence from which a reasonable jury could find supervisory or

municipal liability against Temas in his individual or official capacities under the circumstances

of this case.  Temas is entitled to summary judgment on Count II.

E.  State Law Claims – Counts III and IV

Counts III and IV of the Third Amended Complaint assert Pennsylvania survival action and wrongful death claims against all named defendants in their individual capacities.  The Pennsylvania law claims are based on the same allegations of deliberate indifference as the § 1983 claims.  Because Counts I and II fail as a matter of law, for the reasons set forth above, the named defendants are also entitled to summary judgment on Counts III and IV.  *Carroll v. Lancaster Cty*., 301 F. Supp. 3d 486, 513 (E.D. Pa. 2018) ("Because this Court has granted summary judgment on all of Plaintiffs' § 1983 claims against Defendants [ ], any wrongful death or survival action claims based on alleged violations of § 1983 against those Defendants fail as a matter of law.").  The court need not reach defendants' immunity argument pursuant to 42 Pa. Cons. Stat. § 8541 et seq.


Conclusion

It certainly was tragic that the decedent committed suicide while incarcerated.  No one can argue to the contrary.  The law, however, permits recovery only in certain circumstances, which are not present in this case.  For the reasons set forth above, defendants' summary judgment motions (ECF Nos. 87, 91) will be granted.  Judgment will be entered in favor of the named defendants and the case will be marked closed.

An appropriate order follows.


/s/ Joy Flowers Conti
Joy Flowers Conti
Dated:  July 7, 2020                    Senior United States District Judge